GRANITE PARTNERS, L.P., Granite Corporation and Quartz Hedge Fund, by and through the Litigation Advisory Board of Granite Partners, L.P., Granite Corporation and Quartz Hedge Fund, Plaintiffs,

v.

BEAR, STEARNS & CO. INC., Bear, Stearns Capital Markets Inc., Howard Rubin, Donaldson, Lufkin & Jenrette Securities Corporation, Elizabeth Comerford and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

No. 96 Civ. 7874(RWS).

United States District Court, S.D. New York.

July 26, 1999.

Friedman Kaplan & Seiler, New York, NY (Eric Seiler, Robert J. Lack, Katherine L. Pringle, Lee D. Sossen, of Counsel), Berlack, Israels & Liberman, New York, NY (Steven E. Greenbaum, Edward S. Weisfelner, Scott M. Berman, of counsel), for Plaintiffs.

Fried, Frank, Harris, Shriver & Jacobson, New York, NY (David M. Morris, Albert Shemmy Mishaan, Michael B. deLeeuw, Douglas J. Cardoni, of counsel), for Bear Stearns & Co. Inc., Bear Stearns Capital Markets Inc. and Howard Rubin.

Morgan, Lewis & Bockius, New York, NY (Gary G. Staab, Catherine A. Ludden, Scott S. Balber, of counsel), for Donaldson, Lufkin & Jenrette Securities Corp. and Elizabeth Comerford.

Brown & Wood, New York, NY (A. Robert Pietrzak, Andrew W. Stern, Madeleine J. Dowling, Jonathan J. Brennan, of counsel), for Merrill Lynch, Pierce, Fenner & Smith Inc.

*OPINION*

SWEET, District Judge.

Defendants Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), Elizabeth Comerford ("Comerford"), Bear,

Stearns & Co. Inc., Bear, Stearns Capital Markets Inc. (collectively, "Bear Stearns"), Howard Rubin ("Rubin"), and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") (together with DLJ, Comerford, Bear Stearns, and Rubin, the "Brokers") have moved for partial dismissal of the Second Amended Complaint ("Complaint") in this action pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity. Specifically, the Brokers move to dismiss the following claims: (1) breach of contract (Count III); (2) common law fraud (Counts IV and V); (3) violations of the Sherman and Donnelly Acts (Counts VI and VII); and (7) tortious interference with contracts (Counts XI and XII).

The Brokers have also moved to dismiss Counts XIII through XXI of the Second Amended Complaint, which have been reasserted merely for the purposes of plaintiffs' contemplated appeal. Plaintiffs have agreed, both in their papers and in correspondence to the Court, (*see* Letter from Seiler to Judge Sweet of 10/16/98, at 2), that these counts are deficient under the logic of *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275 (S.D.N.Y. 1998) (*"Granite II"*), and that they should therefore be summarily dismissed.

For the reasons set forth below, the Brokers' motions will be granted in part and denied in part.

### *Parties*

Plaintiff Granite Partners, L.P. ("Granite Partners"), a Delaware limited partnership, was established in January 1990 as an investment fund to invest primarily in mortgage-related securities on behalf of individuals and entities subject to United States taxation.

Plaintiff Granite Corporation ("Granite Corp."), a Cayman Islands corporation, was organized in January 1990 to invest primarily in mortgage-related securities on

behalf of offshore investors and domestic tax-exempt entities, including foundations and pension funds.

Plaintiff Quartz Hedge Fund ("Quartz") (collectively with Granite Partners and Granite Corp., the "Funds"), a Cayman Islands corporation, was established in January 1994 as a vehicle to invest primarily in mortgage-related securities on behalf of offshore investors and others exempt from United States taxation.

The Funds bring this action by and through the Litigation Advisory Board (the "LAB"), which was given the exclusive authority on behalf of and in the name of the Funds' estates to commence, prosecute, settle, or otherwise resolve all unresolved claims and causes of action of the Funds' estates by order of the United States Bankruptcy Court for the Southern District of New York.

DLJ, Bear Stearns, and Merrill Lynch, all Delaware corporations with their principal places of business in New York City, are broker-dealers that transacted business with the Funds.

Comerford, a resident of New York, was at all relevant times a senior vice president of DLJ.

Rubin, a resident of New Jersey, was at all relevant times a senior managing director and the head CMO trader at Bear Stearns.

### *Relevant Nonparties*

David J. Askin ("Askin") is a resident of New Jersey.

At all times relevant to this action, nonparty Askin Capital Management, L.P. ("ACM"), a Delaware limited partnership, was a registered investment advisor, whose principal place of business was New York City. ACM was formed in January 1993 by Askin. Askin also served as ACM's president, chief executive officer, and chief financial officer. ACM became the investment advisor to both Granite Corp. and Granite Partners (and Granite Partners' sole general partner) on or about

January 26, 1993. ACM has been the investment advisor to Quartz since its formation.

### Prior Proceedings

The facts and prior proceedings in this action are set forth in prior opinions of this Court, familiarity with which is assumed. *See Granite II*, 17 F.Supp.2d at 275; *Granite Partners v. Bear, Stearns & Co.*, 184 F.R.D. 49 (S.D.N.Y.1999).

On April 7, 1994, the Funds filed petitions for relief under chapter 11 of the United States Bankruptcy Code. The chapter 11 trustee for the Funds (the "Trustee") initially filed this action in the United States Bankruptcy Court for the Southern District of New York on September 12, 1996. The case was referred to this Court on October 18, 1996. On consent, this Court withdrew the reference from the Bankruptcy Court on December 3, 1996.

On January 27, 1997, the Trustee submitted a Third Amended Joint Plan of Liquidation for the Funds (the "Plan"). Following the Bankruptcy Court's confirmation of the chapter 11 Plan on March 2, 1997, this action has been pursued by the LAB, appointed pursuant to the Liquidation Plan.

The LAB filed its First Amended Complaint in this action on August 4, 1997, naming, in addition to Bear Stearns, Rubin, DLJ, Comerford, and Merrill Lynch as defendants.

In its First Amended Complaint, the LAB asserted the following claims: breach of contract, inducing and participating in breach of fiduciary duty, tortious interference with contracts, rescission of unauthorized trades, breach of duty, conversion, federal and state antitrust violations, *prima facie* tort, common law fraud, negligent and innocent misrepresentation, breach of express warranty, unjust enrichment, objection to claims and interest, and equitable subordination.

On August 25, 1998, the lion's share of the LAB's claims were dismissed in *Gran-*

*ite II*, 17 F.Supp.2d at 275. That decision granted the LAB leave to replead.

On October 16, 1998, the LAB filed the Complaint that is the subject of the Brokers' current motions to dismiss. Oral argument was heard on the instant motions on April 29, 1999, at which time the motions were deemed fully submitted. Additional materials were received from the parties through June 2, 1999.

### Facts

In considering a motion to dismiss, the facts alleged in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985), *modified by*, 793 F.2d 457 (2d Cir.1986). Accordingly, the factual allegations considered here and set forth below are taken primarily from the LAB's Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

Though the LAB's Complaint differs in significant respects from its First Amended Complaint, the basic facts remain the same. As was explained in more detail in *Granite II*, this case arises out of the collapse in early 1994 of the Funds that were managed by Askin and ACM. The Funds invested primarily in collateralized mortgage obligations ("CMOs") created by the Brokers and other broker-dealers. As the Complaint states, "CMOs are securities created from and collateralized by mortgage-backed securities formed from pools of residential mortgages or securities backed by such mortgages." Compl. ¶ 26. ACM, through its president, Askin, purchased the securities for the Funds. The advisory and fiduciary relationships between ACM, or its predecessors, and the Funds were governed by investment advisory agreements. Because CMOs of the type purchased by the Funds vary in their sensitivity to interest rate fluctuations, and

the Funds themselves had distinct investment strategies, ACM's selection of the Funds' securities was critical.

Askin and ACM, the Funds' investment advisor, had fiduciary and contractual obligations to the Funds to make investments with due care and in accordance with the Funds' stated investment objectives. Askin and ACM, however, did not fulfil those obligations, and repeatedly breached their fiduciary and contractual duties. As a result, the Funds acquired portfolios that were full of bullish CMOs, esoteric and highly "toxic" CMOs, and otherwise inappropriate securities. When short-term interest rates rose in early 1994, these securities radically eroded in value.

The Complaint alleges that the Brokers took advantage of ACM and Askin's shortcomings by recommending and selling to the Funds inappropriate and, at times, highly toxic CMOs. The Complaint also alleges that the Brokers deliberately supplied ACM and the Funds with erroneous "marks" purportedly representing the Brokers' own valuations of the Funds holdings—a claim not explicitly made in the First Amended Complaint—despite contracts between the Funds and the Brokers requiring the provision of accurate and timely Broker marks. In their sales of securities to the Funds, the Brokers recouped significant profits—in part due to the Brokers' charging of excessive markups. The LAB's claims concerning the Brokers' charging of excessive markups were also not explicitly made in the First Amended Complaint.

The Funds obtained the majority of their CMOs pursuant to "repos," a financing mechanism that allowed the Funds to pay only a fraction of the cost of each CMO in cash, borrowing the balance from the Brokers. After the Funds' value began to erode in early 1994, the Funds' holdings were liquidated pursuant to Public Securities Association Master Repurchase Agreements ("PSA Agreements") between the Funds and the Brokers. Under these agreements, the Brokers were allowed to make margin calls on the Funds if the value of the securities held on "repo" fell below the amount that the Funds had borrowed, plus an agreed-upon "haircut." [1] Unable to meet margin calls issued by the Brokers, the Funds' portfolios were liquidated.

The Complaint alleges that the Brokers once again took advantage of the Funds during these liquidations. In particular, the Brokers are alleged to have liquidated the Funds' holdings by "deeming" sales of the Funds' securities to themselves at unreasonable, below-market prices. The Brokers allegedly colluded with each other to exchange sham bids, thus facilitating this bad-faith liquidation. Having obtained the Funds' securities at artificially low prices, the Brokers then proceeded to sell those same securities on the open market—recovering profits far in excess of those they would have obtained had they liquidated the Funds' portfolios in a noncollusive manner.

The Brokers have moved to dismiss several repleaded claims that were present in the First Amended Complaint, as well as a few that were not. The Complaint realleges antitrust claims under the Sherman and Donnelly Acts that were dismissed in *Granite II* (Counts VI and VII). The Complaint also includes claims of common law fraud (Count IV) and breach of contract (Count III), not present in the LAB's First Amended Complaint, based upon the Brokers' provision of erroneous marks, as well as a common law fraud claim premised upon the Brokers' failures to disclose the excessive markups they charged 'the Funds for securities (Count V). Finally, the Complaint realleges claims for tortious interference with contracts similar to those

---

1. As the Complaint explains, the "haircut" is a discount that represents "an amount calculated to protect the buyer/lender against adverse market movements should the security have to be liquidated to cover the seller/borrower's obligation to repurchase the security." Compl. ¶ 55.

that were dismissed in *Granite II* (Counts XI and XII). The Brokers have moved to dismiss these claims, but not several others that are not the subject of the instant opinion.

### Discussion

### I. Legal Standards

#### A. Rule 12(b)(6)

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to " 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would warrant relief, a motion to dismiss must be granted. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Additionally, on a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)); *Bissell v. Merrill Lynch & Co.*, 937 F.Supp. 237, 239 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1039, 143 L.Ed.2d 47 (1999).

The parties have submitted numerous exhibits, including deposition transcripts, that could not appropriately be considered on a motion to dismiss. Despite the voluminous nature of these exhibits, and the alacrity with which the parties have interwoven quarrels based upon these materials with contentions based upon the LAB's actual pleadings, these exhibits have been ignored. However, certain documents not attached to the Complaint or explicitly incorporated by reference have been consulted where appropriate under the above standard.

#### B. Rule 9(b)

■ Federal Rules of Civil Procedure 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir.1971). Allegations of fraud must adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992); *Cosmas*, 886 F.2d at 11.

### II. The LAB Has Not Adequately Pleaded Violations of the Sherman and Donnelly Acts (Counts VI and VII)

The LAB has brought suit against Bear Stearns, Rubin, DLJ, and Merrill Lynch pursuant to section 4 of the Clayton Act, which provides:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a) (1997). According to the LAB, the Brokers committed underlying violations of section 1 of the Sherman Act, 15 U.S.C. § 1 (1997), by engaging in a conspiracy to exchange "lowball," accommodation bids· during the initial liquidation of the Funds' holdings. These bids were then used by the Brokers to justify deeming sales of those holdings to themselves at below-market prices. The LAB alleges that by agreeing to forestall a competitive auction the Brokers engaged in a conspiracy in violation of the Sherman Act. The LAB also asserts that the Brokers' collusive bidding scheme was illegal under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340 (McKinney's 1996).

Section 1 of the Sherman Act reads, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony....

15 U.S.C. § 1.

■■ While the Sherman Act, by its terms, prohibits any agreement or combination "in restraint of trade or commerce," *id.*, it has long been recognized that the Act was only intended to outlaw unreasonable restraints. *See Bogan v. Hodgkins*, 166 F.3d 509, 513 (2d Cir.1999) ("[T]he Supreme Court has read the Act to forbid only 'unreasonable' restraints, as a literal reading would absurdly bar all contracts. In particular not all cooperative conduct has a deleterious effect on competition; indeed, some cooperative arrangements foster rather than harm competition.") (citations omitted). As a result, most antitrust claims are evaluated under a "rule of reason," according to which "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific informa-

tion about the relevant business, its conditions before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997); *see Bogan*, 166 F.3d at 513 n. 4. To allege unreasonable restraint of trade, something more than a private dispute must be alleged. The relevant product market must be identified, and the plaintiff must " 'allege how the net economic effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternate source is available' to consumers in that market." *International Television Productions Ltd. v. Twentieth Century–Fox Television*, 622 F.Supp. 1532, 1534 (S.D.N.Y.1985) (*quoting Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1355 (S.D.N.Y. 1982)); *see North Jersey Secretarial School, Inc. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y.1989). The economic impact in the relevant market must be specified, and the plaintiff must show that "the alleged restraint on trade tends or is reasonably calculated to prejudice the public interest." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir.1979).

However, because certain types of restraints have both a predictable and pernicious effect ·on competition, they are deemed unlawful *per se*. In the motions considered in *Granite II*, the Broker defendants maintained that the LAB had only alleged injury to the Funds themselves, not injury to the relevant market, and that this failure to plead restraint of trade required dismissal of the LAB's antitrust claims. By contrast, the LAB sought to neutralize the inadequacy of its pleadings by urging that the Brokers' alleged bid-rigging conspiracy be considered a *per se* violation of the antitrust laws. More specifically, the LAB suggested that because a horizontal bid-rigging scheme had been alleged, it was entitled to *per se* treatment and the LAB need not meet the demands of rule-of-reason analysis. As

was explained in *Granite II*, however, because of the novel and complex nature of the market and instruments at issue in this case, the collusion alleged by the LAB did not constitute a *per se* violation of the Sherman Act. *See* 17 F.Supp.2d at 297.

■ In its papers, the LAB has once again attempted to navigate a shortcut around rule-of-reason analysis, pressing that the so-called "quick look" rule of reason should be applied to its antitrust claims. The LAB's entreaties notwithstanding, "quick look" rule-of-reason analysis would not be appropriate in this case. Abbreviated rule-of-reason analysis, as the Supreme Court has recently had occasion to observe, is only appropriate where "the great likelihood of anticompetitive effects can easily be ascertained," and "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Assoc. v. FTC*, —— U.S. ——, 119 S.Ct. 1604, 1612–13, 143 L.Ed.2d 935 (1999). It was emphatically the holding of *Granite II* that the anticompetitive impact of the Brokers' alleged bidding conspiracy was neither obvious nor easily ascertainable, and that therefore the LAB could not maintain its antitrust claims against the Brokers merely by alleging *per se* violations of the Sherman Act. As *California Dental* indicates, "quick look" rule-of-reason analysis is inappropriate for similar reasons. *See id.* The LAB's request that the Court merely engage in yet another form of truncated antitrust analysis is thus meritless.

■ To withstand a motion to dismiss, a plaintiff making a Sherman Act conspiracy claim must allege a concerted action by two or more persons that unreasonably restrains interstate or foreign trade or commerce. *See In re Nasdaq Market–*

*Makers Antitrust Litig.*, 894 F.Supp. 703, 710 (S.D.N.Y.1995); *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033, 1047 (S.D.N.Y.1993); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Servs.*, 746 F.Supp. 320, 325 (S.D.N.Y.1990); *accord International Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir.1987). The plaintiff "must do more than merely allege that a conspiracy exists, it must provide some factual basis for that allegation." *Fort Wayne Telsat v. Entertainment & Sports Programming Network*, 753 F.Supp. 109, 115 (S.D.N.Y.1990); *see Garshman v. Universal Resources Holding Inc.*, 824 F.2d 223, 230 (3d Cir.1987); *Heart Disease Research Found. v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir.1972). For example, the plaintiff must identify the relevant product market, the co-conspirators, and describe the nature and effects of the alleged conspiracy. *See In re Nasdaq*, 894 F.Supp. at 710–11; *International Television Productions*, 622 F.Supp. at 1537. While dismissal prior to giving a plaintiff ample opportunity for discovery should be granted sparingly in antitrust cases, *see Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976),[2] " '[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998) (*quoting Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

■ As the Second Circuit has held, establishing an unreasonable restraint of trade under the rule of reason involves three basic steps:

**2.** It is worth noting that, as of this opinion's issuance, the LAB will already have had access to a significant amount of discovery material in this action and related actions. While discovery may not be complete, and

this opportunity to conduct discovery does not change the Court's analysis of the LAB's claims, the LAB has already had access to a vast quantity of information from which it could prepare coherent claims.

"[P]laintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market...." *Capital Imaging Assocs. P.C. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 543 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). If the plaintiff succeeds, the burden shifts to the defendant to establish the "pro-competitive 'redeeming virtues'" of the action. *Id.* Should the defendant carry this burden, the plaintiff must then show that the same pro-competitive effect could be achieved through an alternate means that is less restrictive of competition. *Id.; Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir.1995). To meet its initial burden a plaintiff bringing suit under the Sherman Act must "show more than just that he was harmed by defendants' conduct." *Id.* Rather, a plaintiff must show that the alleged restraint of trade had an actual adverse effect on competition as a whole in the relevant market. *See id.; see also Jefferson Parish Dist. No. 2 v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("Without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws...."). This is so because the ultimate aim of the Sherman Act is to protect competition, as opposed to competitors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As another Second Circuit decision, *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537 (2d Cir. 1993), has explained:

> Under [the rule of reason test] ... plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. Insisting

on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.

*Id.* at 543.

Additionally, it is well-settled that "[a] private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing 'injury causally linked to an illegal presence in the market.'" *Atlantic Richfield Co. [ARCO] v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (*quoting Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Rather, a private plaintiff must demonstrate the existence of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690; *see George Haug*, 148 F.3d at 139 ("The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'") (*quoting Capital Imaging*, 996 F.2d at 543); *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1375 (11th Cir.) ("In many instances, those displaced by a merger suffer an economic loss. However, this loss is not an antitrust injury because it does not flow from that which makes a merger unlawful. Injuries like that suffered by Florida Seed do not 'coincide[ ] with the public detriment tending to result from the alleged violation.'") (*quoting Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1450 (11th Cir.1991)), *cert. denied*, — U.S. ——, 118 S.Ct. 296, 139 L.Ed.2d 228 (1997). Even injuries with a causal connection to antitrust violations will not qualify as "antitrust injuries" unless they are "attributable to an anti-competitive aspect of the practice under

scrutiny." [3] *ARCO*, 495 U.S. at 334, 110 S.Ct. 1884; *see generally* 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 362a, at 209–16 (rev. ed.1995) (discussing antitrust injury requirements). As the *ARCO* Court noted, this antitrust injury requirement is conceptually distinct from the demands of the rule of reason or *per se* rule utilized by courts to determine whether a Sherman Act violation has occurred in the first instance:

> The per se rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act. Per se and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," i.e., whether its anticompetitive effects outweigh its procompetitive effects.

**3.** As the Second Circuit recognized some time ago, an *antitrust plaintiff's own injuries must* be causally linked to the antitrust violation(s):
> The statutory requirement [of section 4 of the Clayton Act] that treble damage suits be based on injuries which occur "by reason of" antitrust violations expressly restricts the right to sue under this section. There must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a "material cause" of or a "substantial factor" in the occurrence of damage. And this connection must also link a specific form of illegal act to a plaintiff engaged in the sort of legitimate activities which the prohibition of this type of violation was clearly intended to protect.
> *Billy Baxter, Inc. v. Coca–Cola Co.*, 431 F.2d 183, 187 (2d Cir.1970).

**4.** In its First Amended Complaint, the LAB alleged only that "nationwide competition and trade were injured, unreasonably restrained, and eliminated in relevant markets under the Sherman Act," First Amend. Compl. ¶ 214, and that the Brokers' acts "restrained competition within the State of New York." *Id.* ¶ 221.

**5.** As the Ninth Circuit has observed, a plaintiff's failure to establish anticompetitive effect constitutes a failure to establish any violation of the antitrust laws whatsoever, and thus

. . .

The purpose of the antitrust injury requirement is different. It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief.

495 U.S. at 342, 110 S.Ct. 1884.

■ While the LAB's Complaint contains allegations concerning market impact that were conspicuously absent from the First Amended Complaint,[4] it fails to plead adequately the anti-competitive effect that is a necessary predicate to all antitrust violations. Moreover, even construing its allegations in favor the LAB, the Complaint fails to allege antitrust, as opposed to individual, injury—as is required in order to bring suit as a private attorney general under the Clayton Act.[5]

renders superfluous any discussion of antitrust standing or injury under section 4 of the Clayton Act:
> [W]e need not decide whether appellants have met the requirements for antitrust standing, because they have failed to establish any violation of the antitrust laws.
> . . .
> As Professors Areeda and Hovenkamp have observed:
>> When a court concludes that no violation has occurred, it has no occasion to consider [antitrust] standing.... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.
> 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 360f, at 202–03 (rev. ed. 1995).... The Sherman Act requires,

The gravamen of the LAB's Sherman Act claim is that the Brokers engaged in a collusive scheme to offer each other "lowball" bids, thus affording the Brokers the opportunity to liquidate the Funds' holdings by "deeming" various sales to themselves at artificially low prices. According to the LAB, because these deemed sales were at a price significantly below the actual value of the Funds' liquidated holdings, the Brokers were able to recover significant profits when they later resold those same securities in the secondary market. Had the initial liquidations occurred at market prices, the LAB contends, the Brokers would not have been able to recover those profits.

Manifold market injuries have now been alleged in the Complaint. The LAB asserts that, "having colluded to obtain the Funds' securities at below-market prices, on information and belief, the secondary traders employed by the Brokers were instructed to sell the securities as quickly as possible, so long as they realized, on a hedge adjusted basis, as least as much as they paid for them in the deemed sales." Compl. ¶ 208. The LAB contends that, presented with the task of selling an unusually large volume of securities, DLJ and the other Brokers entered into massive hedging transactions calculated to provide protection against losses due to interest rate movements—provided that the Brokers sold their positions quickly. See Compl. ¶¶ 208, 215. The end result of this massive liquidation, the LAB claims, was damage to the markets for esoteric CMOs—namely inverse IOs, inverse floaters, and super POs—as the flooding of the market crowded out market participants with long positions in those types of instruments, depressed prices below the instruments' "intrinsic 'recreation value,'" and

resulted in the marking down of the securities held by other market participants. Compl. ¶¶ 209–11. As a result, so claims the LAB, margin calls were issued on other market participants and increased "haircuts" were demanded with respect to comparable instruments. See Compl. ¶ 212.

According to the Complaint, the increased costs of capital resulting from the massive CMO sell-off also reduced the ability of highly leveraged firms to participate in the markets for inverse IOs, inverse floaters, and super POs. See Compl. ¶ 212. The short-term hedging strategy employed by the Brokers, which involved short sales of large amounts of United States Treasury and other governmental agency securities, also allegedly impacted interest rates and influenced the price of Treasury notes. See Compl. ¶ 217. To illustrate its claims of tangible market impact, the LAB refers periodically in its Complaint to specific funds and market participants that it believes were injured during the market stampede of 1994. See Compl. ¶¶ 209, 212–13.

The LAB's essential claim of injury derives from the liquidation of the Funds' own holdings through deemed sales. Even assuming that those deemed sales were the result of a rigged bidding process, and that the Funds therefore recovered less in return than was their due, however, the LAB has not satisfactorily alleged that these sales had any impact whatsoever on the relevant market for CMOs. Rather, as the Complaint indicates, it is the later *resale* of the instruments by the Brokers that is claimed to have caused market damage. It is the subsequent hedging by the Brokers, in order to protect themselves from falling CMO values, and that hedging's attendant impact on the market

at a minimum, that appellants prove that the PAC–10's actions had an anticompetitive effect. It is on this showing that appellants' claim fails, and accordingly we decide this case on the merits.
*Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1318 (9th Cir.1996).

While the LAB's failure to adequately plead the anticompetitive effects of the Brokers' bidding conspiracy renders any discussion of antitrust injury under section 4 of the Clayton act unnecessary, the LAB's failure to plead antitrust injury is nevertheless noteworthy as an alternate basis for decision.

for Treasury notes, that is claimed to have damaged the market. Indeed, it is the second "liquidation" by the Brokers, not the initial liquidation in which the Funds' holdings were deemed sold to the Brokers, that is alleged to have caused market injury.

There is a critical disjunction, however, between the market injury asserted, the injury allegedly suffered by the Funds, and the Brokers' alleged anticompetitive conspiracy. According to the LAB, the Brokers were able to recoup greater profits by deeming sales to themselves at artificially low prices and then reselling the CMOs on the open market. If true, this would no doubt be of great consternation to the Funds and to their various investors. However, despite the LAB's transparent attempts to conflate the Brokers' deemed sales and subsequent resales, nothing in the Complaint indicates that the subsequent resale by the Brokers was anything other than normal, given the state of the market, or that the collusive bidding arrangement among the Brokers did anything to impact the market in which the securities were resold. Even assuming that the Brokers intended to provide each other with lowball bids for the nefarious purposes stated in the Complaint, the LAB has failed to adequately allege any adverse effect on competition within the relevant market for CMOs. *See K.M.B. Warehouse Dist.*, 61 F.3d at 130 ("Without some evidence of an adverse impact on competition in either the interbrand or intrabrand market, the fact that customers induce a seller to refrain from dealing with another potential customer in order to limit competition does not satisfy a plaintiff's initial burden under § 1. KMB's evidence of defendants' intent, even belief that what they were doing might be unlawful, is unavailing in the absence of evidence of anticompetitive effect.") (citations omitted); *Capital Imaging Assocs.*, 996 F.2d at 547 ("In sum, Capital's position is simply that it has been harmed as an individual competitor. It has not shown that defendants' activities have had any adverse impact on price, quality, or output of medical services offered to consumers in the relevant market."); *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.1978) (finding that collusive scheme involving sham bids, even if reprehensible, did not constitute antitrust violation, as plaintiffs failed to maintain "their burden to show that the combination in any substantial way either did or could affect interstate commerce by controlling market prices, imposing undue limitations on competitive conditions, or unreasonably restricting competitive opportunity."); *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co., Inc.*, 525 F.Supp. 749, 750 (E.D.N.Y.1981) ("No violation of section 1 of the Sherman Act is possible absent proof of anticompetitive effect beyond the injury to plaintiffs, and facts must be pleaded from which effect can be inferred.").[6]

At most, the Complaint establishes that the Brokers were able to post significant gains where they may otherwise have suffered losses when reselling the CMOs. However, the Complaint also indicates that the Brokers had an inherent interest in quickly liquidating the instruments with which they had become saddled.[7] The

---

6. Setting aside the absence of any plausibly-asserted causal connection between the deemed sales and the market injuries alleged, the LAB has failed to even allege that the Brokers' resales in the secondary market for CMOs were the driving force behind the general decline of CMO prices. The LAB certainly has not alleged that the Brokers were the only, or even the primary, entities unloading CMOs into the soft market in 1994, or that their secondary market sales even set the prices for other market participants.

7. The Complaint makes plain the secondary traders' concerns about taking on a large inventory of esoteric CMOs, which they expected to behave bullishly and thus decline under then-existing market conditions. Compl. ¶ 247. The Complaint also makes plain the concerns that the secondary traders could be expected to have about being charged with any losses from resales of those CMOs. Indeed, according to the LAB these very concerns gave the Brokers the motive to engage in a collusive bidding scheme.

LAB's implicit assumption that the Brokers would have held onto the liquidated instruments for a longer period of time, were they unable to quickly dispose of them at a profit, is unrealistic and unconvincing. After all, according to the LAB's own pleadings the CMOs obtained from the Funds were highly volatile, even "toxic," and the market for those CMOs was declining in the face of interest rate increases.[8] Consequently, there is nothing in the Complaint that suggests that the resale of the CMOs was anything other than ordinary, given the market into which those CMOs were being dumped and the Brokers' interest in relieving themselves as quickly as possible from the risks inherent in holding large quantities of quickly devaluing securities. While the markets were flooded with mortgage instruments at "fire sale" prices, *see* Compl. ¶ 210, by no means does this alone indicate that the Brokers' collusive conduct was the cause. Moreover, while the short-term hedging strategy employed by the Brokers may well have been less profitable had the Brokers not initially obtained the Funds' securities at artificially low prices, there is no indication that this strategy was used as a result of the Brokers' collusive conduct—as opposed to the Brokers' desire to unload a large quantity of securities in a short period of time. Given the LAB's own explanation of the benefits of this hedging strategy, such hedging could be expected as short-term protection against interest rate fluctuations even had the Brokers obtained the Funds' instruments at non-collusive prices.

While the Brokers might have recovered an untoward windfall upon resale, even one impossible without improper collusion, the LAB has not alleged that the *collusion* itself had any impact whatsoever on the secondary market for CMOs, or upon the price at which the Funds' CMOs were resold. Indeed, as with the liquidations of many other types of volatile securities, the massive dumping of CMOs onto the market by the Brokers and others might well have occurred regardless of the price at which the Brokers obtained the Funds' instruments—if only to minimize what could be anticipated to be considerable losses.[9] After all, assuming the validity of

Compl. ¶ 248. The LAB's opposition papers make this point as well. As the LAB states:

> The Brokers argue that the Funds' theory makes no sense—that even if the Brokers succeeded in obtaining the CMOs at below-market prices, they should have sold them for as much as they could earn. This argument ignores the Brokers' alleged desire to dispose of the CMOs quickly to reduce their exposure, which cut against any desire to hold out for the best resale price. The Complaint explains that the traders were afraid of assuming responsibility for a large volume of liquidated CMOs and that they had confidence in their hedging activity (as a protection against interest rate changes) only if they were able to dispose of the bulk of the acquired securities quickly.

(Pls.' Mem. Law Opp. Mots. Part. Dismiss at 23.) Because the Brokers would have this very same interest in a quick liquidation even had they obtained the CMOs at market prices, the LAB's contention that the flooding of the market for those instruments was a result of the Brokers' collusion is highly questionable.

8. To be sure, the LAB does not explicitly make this point as such. However, the Complaint provides all the necessary raw material. First, the Complaint alleges that interest rates rose in February and March of 1994, immediately preceding the liquidations that are the subject of this lawsuit, and that the Funds therefore experienced an erosion of value. Compl. ¶¶ 7, 139–40. Second, the Complaint alleges that the Funds were in possession of a large number of high-risk instruments sensitive to interest rate changes, and that Brokers sold the Funds inappropriately "bullish" instruments—that could be expected to decrease in value when interest rates rise. Compl. ¶¶ 31–37, 43–44, 47, 50, 80–84, 112. Assuming the truth of the Complaint's allegations, one could hardly expect anyone—let alone the Broker defendants—to be enthused at the market prospects for bullish instruments during the interest rate environment of March 1994. The Complaint indicates that the Brokers were, in fact, concerned about the prospects of holding onto bullish securities that would "decline in value in the then-existing market conditions." Compl. ¶ 247.

9. In fact, the Complaint itself notes that "Bear Stearns' secondary market traders, including Rubin, were concerned that if they acquired the Funds' portfolio at fair market

the LAB's own allegations, after the deemed sales of the Funds' holdings the Brokers were in possession of a significant number of securities known within industry circles as "nuclear waste."

Furthermore, the injuries ostensibly suffered by the Funds do not "flow" from that which would render the Brokers' collusion illegal under the Sherman Act—the impact of Broker resales upon the secondary market for CMOs, and of massive hedging upon the market for Treasury notes. *See ARCO*, 495 U.S. at 337, 110 S.Ct. 1884 ("[R]espondent has not suffered 'antitrust injury,' since its losses do not flow from the aspects of vertical, maximum price fixing that render it illegal."); *cf. Legal Economic Evaluations, Inc. v. Metropolitan Life Ins. Co.*, 39 F.3d 951, 954 (9th Cir.1994) ("The difficulty with Weil's case is that its injury does not match either the mischief about which it complains or the markets in which it occurred."). While the LAB now contends that the Brokers' massive dumping of CMOs onto the open market negatively affected the price of those CMOs, thereby injuring other investors who held those types of obligations, the Funds no longer had any stake whatsoever in the price at which their CMOs were trading once the Brokers conducted their initial liquidation of the Funds' holdings. Indeed, the Complaint does not indicate that the Funds were participants at all in the secondary market for CMOs, once the Brokers had initiated margin calls and

deemed sales of the Funds' holdings to themselves. *See Amarel v. Connell*, 102 F.3d 1494, 1508 (9th Cir.1996) ("As a corollary to the requirement that 'the alleged injury be related to anti-competitive behavior,' we require that 'the injured party be a participant in the same market as the alleged malefactors.'") (*quoting Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir.1985)). The Complaint also does not reveal any injury suffered by the Funds themselves as a result of the alleged disruption of the market for Treasury bonds.

The LAB has characterized the bidding scheme alleged in its Complaint as one of collusive "monopsony," whereby unreasonable restraints on trade result from the obtaining of products at below-market prices.[10] Of course, according to the Complaint the bidding scheme engaged in by the Brokers ultimately restricted the Funds' access to a real market for their own CMOs and, as alleged, caused the Funds harm when the Brokers deemed sales to themselves. It is also true that the Brokers' scheme purportedly constrained a seller's access to potential purchasers—thus allowing the colluding parties to set lower prices and recover more profit. However, the LAB cannot survive a motion to dismiss merely by talismanically labeling the Brokers' collusive behavior as "monopsonist." In this case, no plausible connection between that collusion and

---

value, they would be unable to liquidate such a large portfolio in a short time, without suffering trading losses that would be charged to their trading desk." Compl. ¶ 154.

While the Brokers' desires to recover gains on resales of distressed CMOs may well have motivated them to engage in collusive bidding practices, this allegation of motive alone does not establish any causal link between that bidding and the market's response to the subsequent liquidation.

10. Monopsony is to the supply side of a market what monopoly is to the demand side. *See* Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L.Rev. 297, 306 (1991). As Professors Blair and Harrison have observed:

Monopsony power involves the ability of buyers to lower input prices below competitive levels, which requires the ability to restrict the quantity demanded of the input. In either case, the quantity that would be exchanged is less than the quantity exchanged under competitive conditions, and the result is allocatively inefficient. Ironically, the reduced input prices the monopsonist enjoys do not lead to reduced output prices. In fact, when the monopsonist has market power in its output market, the reduced input prices cause higher output prices.

*Id.*

market injury has been alleged. Indeed, there is no allegation that the Brokers enjoyed any monopsony power whatsoever with respect to the secondary market for CMOs.

The LAB's reliance upon *Three Crown,* 817 F.Supp. at 1033, is misplaced. In *Three Crown,* plaintiffs who had substantial "short" positions in two-year Treasury notes brought suit, alleging *inter alia* that the defendants in that action conspired in violation of the Sherman Act to "squeeze" the secondary and financing markets for those notes. The defendants in that case held significant "long" positions in two-year Treasury notes, and purportedly manipulated the supply and circulation of those notes to their benefit. *See id.* at 1037. Even a cursory glance at *Three Crown* reveals the marked differences between that case and the case at bar. In that case, the injuries allegedly suffered by plaintiffs and those inflicted upon the relevant market were one in the same, in that restrictions on the supply and circulation of Treasury notes forced investors to pay artificially inflated prices for those notes. The injuries suffered by the *Three Crown* plaintiffs had their genesis in the very same anticompetitive "squeeze" that allegedly injured other "short" investors. *See id.* at 1048 n. 36. As explained above, however, in this case there is a critical disjunction between the injuries suffered by the Funds and the injuries to the relevant market, and there is no satisfactory allegation whatsoever that the Brokers' collusion itself caused injuries to other investors or to the relevant market.[11]

*Reid Brothers Logging Co. v. Ketchikan Pulp Co.,* 699 F.2d 1292 (9th Cir.1983), is similarly inapposite. In *Reid Brothers Logging,* the defendants conspired to dominate all segments of the Alaskan timber industry, in part by refusing to compete as between themselves for timber sales—thus allowing the defendants to recover a greater profit spread in spite of a chronic shortage of timber—and by frustrating the efforts of others to enter the Alaskan timber market. *See id.* at 1297–98. While the anticompetitive scheme engaged in by the defendants in *Reid Brothers Logging* did involve collusive bidding practices, *see id.,* this is where any similarity to the instant case ends. In that case, plaintiffs asserted, and the court found, direct anticompetitive effects within the relevant market. The bidding conspiracy, as well as the collusive approach to purchasing timber, frustrated competition and resulted in harm to the plaintiff—a logging company rendered captive to the plaintiffs, and upon which an unlawful flat rate, multi-year logging contract was imposed due to defendants' illegal control of the Alaskan timber industry. *See id.* at 1300–01. Unlike the instant action, there was no disjunction between the injuries suffered by the plaintiff and the injuries to the relevant market. Indeed, in that case the former flowed directly from the latter.

---

11. The consent judgment and stipulation between Salomon Brothers and the United States arising out of the same basic set of facts as the *Three Crown* case, which the LAB has invoked for its own purposes, also reveals the marked differences between the Salomon "squeeze" and the instant case. The consent stipulation indicates that "[t]he alleged conspiracy affected the price of the notes in the secondary market . . . and the interest rate paid by persons, such as Solomon, that lent the notes in exchange for cash." 57 Fed.Reg. 29,743, 29,744 (July 6, 1992). As the consent stipulation further states:

This scheme had the effect of limiting the supply of May two-year notes available in the secondary and financing markets, thereby ensuring that persons who had sold May two-year notes short in the when-issued market could obtain such notes only by purchasing them at artificially high and non-competitive prices in the secondary market or by borrowing them in exchange for cash at artificially low and non-competitive special rates in the financing market. This course of conduct continued for a period of time during which Salomon and its co-conspirators earned supracompetitive rates on transactions in the notes that are the subject of this action.

*Id.* at 29,745.

As the Honorable Richard J. Cardamone observed in *Capital Imaging Assocs.*, 996 F.2d at 537, "[a]ntitrust law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." *Id.* at 539. Given the relevant market asserted in the Complaint and the absence of any plausibly asserted connection between that market and the Brokers' collusive behavior, the LAB's Complaint appears to suffer from a philosophical infirmity that further amendment could not cure.

In this case, the LAB seeks redress of its private grievances with the Brokers under the aegis of the Sherman Act, despite the absence of any cognizable link between those grievances and the market injuries alleged. As was observed in *Granite II*, however, such grievances are more appropriately raised in the context of the LAB's contract claims against the Brokers. *See* 17 F.Supp.2d at 298. " 'The cornerstone of [antitrust] law is competition. Congress'[s] intent in passing the Sherman Act was not to subject all business and commercial torts to the scrutiny of federal [antitrust] law.' " *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 837 (S.D.N.Y.1988) (*quoting Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F.Supp. 822, 826 (N.D.Cal.1986)). Furthermore, "[t]he Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else." *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 783 (5th Cir.1974), *quoted in Sitkin Smelting & Ref.*, 575 F.2d at 448. Accordingly, Count VI of the Complaint is dismissed.

■ New York's antitrust law, the Donnelly Act, is "modeled on the Sherman Act and should be construed in light of federal precedent," *Kramer v. Pollock–Krasner Found.*, 890 F.Supp. 250, 254 (S.D.N.Y.1995); *see X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518, 611 N.Y.S.2d 786, 789, 634 N.E.2d 158, 161

(1994). The LAB's Donnelly Act claim in Count VII of the Complaint is therefore dismissed as well.

### III. *The LAB Has Adequately Pleaded that the Brokers Breached Contracts With the Funds to Provide Accurate Marks (Count III)*

The LAB's Complaint contains a claim for breach of contract that was not present in the First Amended Complaint, and therefore not addressed in *Granite II*. Undergirding this claim, according to the Complaint, are the Brokers' failures to abide by the terms of contracts requiring the provisions of accurate marks to the Funds.

The LAB contends that on October 28, 1992, Askin, on behalf of both Granite Corp. and Granite Partners, sent letters (the "October letter(s)") to each of the Brokers asking them to agree that month-end "marks"—a broker-dealer's statement of the current market value of a security—would henceforth be timely and accurately provided. According to the Complaint, these marks were requested by ACM or its predecessor, to be indicated on "Month End Pricing" reports, and the Brokers were aware of the importance of those marks to the Funds in "evaluating and reporting on the overall portfolios of the Funds." Compl. ¶ 69. Though the LAB's specific allegations concerning the Brokers' provision of inaccurate marks differ depending on the specific Brokers involved, the LAB's basic claim is that the Brokers supplied the Funds with marks rather different than the Brokers' actual valuations of the securities.

The Complaint alleges that on or about November 2, 1992, DLJ, through Richard Whiting, accepted the terms of the October letter in writing. As far as the other Brokers are concerned, however, the Complaint is more circumspect. Merrill Lynch and Bear Stearns are only alleged to have "communicated [their] . . . acceptance of its terms." Compl. ¶ 73. Though Quartz was not formed as of October, 1992, the

Complaint alleges that Quartz entered into the same agreement with the Brokers at or about the time of its formation. *See* Compl. ¶ 74.

While the Complaint does not specifically incorporate by reference the October letters, or attach either copies of those letters or any written acceptance, copies of the letters have been submitted as exhibits to the Brokers' papers. (*See* de Leeuw Decl. Ex. 6; Balber Aff. Ex. 8; Pietrzak Aff. Ex. B.) Because the Complaint clearly identifies the October letters, and the LAB has obviously relied upon their terms in bringing suit, the Court will consider these exhibits on a 12(b)(6) motion. *See Granite II*, 17 F.Supp.2d at 300.

The letters, which were sent by David Askin on Whitehead/Sterling Advisors, L.P. stationary, request that the Brokers agree to have mark sheets completed and returned by the close of business on the second business day following the month-end. The letters also state that the marks must be both timely and accurate, and that the marks are critical to the reporting of Fund performance. The letters request that the Brokers acknowledge their agreement with their terms by signing in a space provided. In the event that a Broker does not agree to those terms, Askin writes, then the amount of business done with that firm will be significantly reduced.

The Brokers have raised a panoply of grounds for dismissal of this particular contract claim, asserting *inter alia* that the LAB does not have standing to raise the claim, that the LAB has not pleaded valid acceptance on the parts of Bear Stearns and Merrill Lynch, and that any contract is invalid for want of consideration. Both Merrill Lynch and Bear Stearns take the position that the October letters' own terms require a written acceptance, and that even if this were not the case New York's statute of frauds would require one. DLJ has not attacked the validity of its acceptance, as the Complaint alleges the letter was signed by a DLJ representative.

## A. *The LAB's Standing*

Since any standing infirmities would render the LAB's efforts to recover for breach of contract fruitless, this issue is addressed first.

The Brokers contend that because the October letter was sent by Askin on behalf of ACM's predecessor in advising the Funds, Whitehead/Sterling, the LAB does not have standing to enforce any binding agreement between the Brokers and the investment advisor. Furthermore, DLJ remonstrates that the existence of specific advisory agreements governing the relationships between the Funds and the advisor make clear that any agreement to provide marks would have been between the advisor and the Brokers alone.

While under New York law only a party to a contract can typically bring suit to recover for its breach, one can certainly enforce a contract entered by an authorized agent. *See Merrick v. New York Subways Adver., Co.*, 14 Misc.2d 456, 459, 178 N.Y.S.2d 814, 818 (Sup.Ct.1958) ("[I]t is elementary that one may sue upon a contract made for him by his agent.") (*citing* 2 Williston on Contracts 1038 ¶ 352 (rev. ed.1936)); 2A N.Y.Jur.2d, Agency §§ 103 *et seq.* (1998).

Under New York law a third party is also allowed to enforce a contract if that party is an intended beneficiary of the contract. *See Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991). The general test for third-party beneficiary status, as adopted by New York from the Restatement (Second) of Contracts is as follows:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee

to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefits of the promised performance.

Restatement (Second) of Contracts § 302 (1981); *see Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44–45, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208, 212 (1985) (adopting Restatement position). When determining the intentions of the contracting parties, the intention of the promisee is of primary importance. *See Drake v. Drake*, 89 A.D.2d 207, 209, 455 N.Y.S.2d 420, 422 (4th Dep't 1982). Where the obligation to perform to the third-party beneficiary is not expressly stated in the contract at issue, a court "may look to surrounding circumstances to determine whether the contracting parties intended to benefit a third party." *United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.*, 988 F.Supp. 367, 371 (S.D.N.Y. 1997) (citations omitted); *see Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991); *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir.1989).

■ While the Complaint does not specifically refer to Whitehead/Sterling by name, it does state that Askin sent the October letters "on behalf of" Granite Corp. and Granite Partners, Compl. ¶ 70, and that the "same contractual arrangement" was entered by Quartz at the time of its formation. The Complaint also states that, "from September 1991 to December 1992, Askin was employed by the former investment advisor for Partners and Corp." Compl. ¶ 18.

At this stage in the litigation, there is little reason to question the LAB's standing to seek enforcement of any contract formed pursuant to Askin's October 28, 1992 letters or any similar letters. The LAB's Complaint, while sparse, characterizes the contract as one between the Brokers and the Funds. The letters specifically indicate that the provision of marks is for the Funds' direct benefit, and their

language could support the proposition that Askin was operating as an agent of the Funds—which is not at all surprising given the Funds' reliance on Askin and the successive investment advisors for the selection and purchase of securities. The letter's language is particularly revealing in this regard:

> As the Granite Funds continue to grow, so does our commitment to provide accurate and timely information to our investors. A critical component of this commitment is our ability to report our performance as soon after the end of each month as possible. This is where Bear Stearns comes in.

> An important part of the service you provide the Granite Funds is the monthly marks on the bonds in our portfolios. These marks must be timely as well as accurate....

> Therefore, effective with the October 1992 month-end, we would like Bear Stearns to have our mark sheets completely filled-out and returned to us by the close of business on the second business day following the month-end....

> Our business operates in a very competitive marketplace, just as yours does. The failure to provide our clients with the highest quality service costs us customers, just as surely as does poor portfolio performance....

(de Leeuw Decl. Ex. 6.)

This language certainly does not obviate any possibility that Askin was writing on behalf of the Funds. The Brokers' protestations notwithstanding, the LAB's failure to explicitly plead its agency or third party beneficiary theories in its Complaint does not merit dismissal. As the Second Circuit observed in *Flickinger*, 947 F.2d at 595, "federal pleading is by statement of claim, not by legal theory." *Id.* at 600 (citations omitted). Since the LAB's breach of contract claims in connection with the provision of inaccurate marks appear to be dependent upon the October letters, and the very terms of those letters

indicate that Askin could have been writing on behalf of the Funds—or at the very least for their direct benefit—dismissal would not be appropriate at this juncture.[12] Whether or not Askin was actually acting as an agent for the Funds when he wrote the letter, or whether the Funds were intended third-party beneficiaries, are issues more appropriately decided at a later date.

The Brokers' contentions regarding the capacity in which Askin sent the October letters are rendered all the more suspect when one considers *Granite II*'s holdings regarding the doctrine of *in pari delicto*. In *Granite II* it was held that the Funds, acting through Askin and ACM, were active and voluntary participants in the securities purchases of which they now complain. *See* 17 F.Supp.2d at 309. In reaching this conclusion favorable to the Broker defendants, the Court relied on ACM's role as agent of the Funds. *Id.* at 308. While the issues presented in *Granite II* were not the same as those presented by the LAB's current contract claims, Askin's or the investment advisor's agency to act on behalf of the Funds cannot merely be invoked by the Brokers for their benefit alone. This agency may well turn out to be a double-edged sword—precluding recovery for certain claims under the doctrine of *in pari delicto*, even as it gives the Funds standing to assert claims based on contracts allegedly entered by Askin on their behalf.

That the relationship between the Funds and its advisors were governed by other investment advisory agreements does not, as DLJ suggests in its papers,[13] alter this result. DLJ's apparent position is that, because ACM or its predecessors were

themselves solely responsible for preparing and reporting valuations of the Funds' securities, any agreement concerning the provision of marks as valuations would necessarily be between the advisors and the Brokers alone. This overlooks, however, both the precise role that ACM and its predecessors played as the Funds' advisors and the appropriate level of scrutiny on a motion to dismiss. While the contractual relationship between the Funds and the advisors did give the investment advisor responsibility for valuing the Funds' holdings, and governed the respective rights as between advisor and advisee, this relationship could easily have made the advisor an agent of the Funds for their many other dealings with Brokers and investors. A contractual agreement to provide marks might have been entered into by the advisor on behalf of the Funds, just as the advisor could agree to purchase various securities on behalf of the Funds. Without further inquiry one cannot say. Simply because the subject matter of a contract concerned the domain of issues governed by the investment advisory agreements, however, does not mean that Askin could not also have written the October letters on behalf of the Funds.

**B. *Alleged Invalidity of Oral Contracts Under Terms of October Letters and New York Statute of Frauds***

 Merrill Lynch and Bear Stearns have also expended considerable efforts to convince the Court that, either by the explicit terms of the October letters or under New York's statute of frauds, any contracts formed pursuant to those letters must be accepted in writing. The Com-

---

**12.** According to the DLJ defendants, while "Askin may have been the Funds' agent for some purposes," in sending the October letter he "acted not on behalf of the Funds, but to facilitate Whitehead/Sterling's performance of its duties to the Funds under the Investment Advisory Agreements." Resolution of this disputed agency issue, however, would not be appropriate on a motion to dismiss.

**13.** DLJ claims that "the LAB's claim that the Dealers were contractually obligated to provide valuations to the Funds is obviated by the contract between ACM and the Funds upon which the LAB premises its tortious interference claim in Count XI." (DLJ/Comerford Mem. Law. Supp. Mot. Part. Dismiss at 20–21.)

plaint's failure to plead written acceptance or the LAB's failure to append a countersigned copy of the letter, the Brokers press, merits dismissal. Because DLJ concedes that it signed the letter, it has not challenged the manner of its acceptance.

It is well-established that an offeror may, by the terms of its offer, dictate the manner of an offeree's acceptance. *See Brand v. 15 West 72nd St. Owners Corp.,* 117 Misc.2d 652, 655, 458 N.Y.S.2d 1011, 1013 (Sup.Ct.1983); *Gram v. Mutual Life Ins. Co.,* 300 N.Y. 375, 382–83, 91 N.E.2d 307, 311 (1950). This includes requirements that the acceptance be communicated in writing. *See Golden Dipt Co. v. Systems Eng'g & Mfg. Co.,* 465 F.2d 215, 216–17 (7th Cir.1972); *Antonucci v. Stevens Dodge, Inc.,* 73 Misc.2d 173, 175–76, 340 N.Y.S.2d 979, 982–83 (Civ.Ct.1973).

Furthermore, under New York law, the application of which does not appear to be disputed, neither contracts incapable of being performed within a year nor contracts for the sale of securities entered prior to October 10, 1997 may be entered orally. Under N.Y. Gen. Oblig. Law § 5–701 (McKinney's 1989), which the Brokers have invoked, an agreement, promise, or undertaking must be subscribed in writing by the party to be charged if, "[b]y its terms [it] is not to be performed within one year from the making thereof." For section 5–701 to apply the agreement's terms must truly be incapable of performance in less than one year. The parties' ability to terminate the agreement without breach in less than a year's time takes the agreement outside of the statute of *frauds. See Rail Europe, Inc. v. Rail Pass Express, Inc.,* No. 94 CIV. 1506(PKL), 1996 WL 157503, at *4 (S.D.N.Y. Apr. 3, 1996).

Under former N.Y. U.C.C. § 8–319(a) (McKinney's 1990), which the Brokers have also invoked and was repealed effective October 10, 1997, *see* 1997 N.Y. Laws ch. 566, § 5, "[a] contract for the sale of securities is not enforceable by way of action or defense unless ... there is some

writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price." While this writing requirement no longer exists, oral contracts or contract modifications entered into prior to October 10, 1997 are still governed by this provision. *See* N.Y. U.C.C. § 8–601(b); *Goshorn v. Bonamie,* No. 95–CIV–188 RSP/DNH, 1998 WL 166832, at *7 (N.D.N.Y. Apr. 8, 1998).

Because the LAB has alleged that any contracts formed pursuant to the October letters had as their consideration the purchase of securities, the Bear Stearns defendants have claimed that any oral acceptance is void under the U.C.C. provision operative at the time of the contract.

The LAB has demonstrated a certain amount of elasticity in fashioning its Complaint, especially when one compares its specific allegations concerning DLJ's written acceptance to its purposely vague allegations concerning the other Brokers' acceptance of the October letters. However, the LAB's failure to specifically plead written acceptance of the October letters' terms does not currently merit dismissal of its contract claim as against Bear Stearns or Merrill Lynch, and extended discussion of New York law on this matter is better saved for another day.

The Brokers are certainly correct in observing that this Court has previously dismissed, pursuant to the statute of frauds, contract claims challenged under Rule 12(b)(6), Fed.R.Civ.P. However, in those cases the complaint itself or the parties' papers left little question that the plaintiff was claiming the existence of a binding, oral contract. *See, e.g., Keough v. Texaco, Inc.,* No. 97 Civ. 5981 LMM, 1999 WL 61836, at *9 (S.D.N.Y. Feb. 10, 1999) (granting defendant's motion to dismiss contract claim based on statute of frauds, given that employment contract alleged was oral); *Huntington Dental & Med. Co.*

*v. Minnesota Mining & Mfg. Co.*, No. 95 Civ. 10959(JFK), 1998 WL 60954, at *1, 3–4 (S.D.N.Y. Feb. 13, 1999) (finding contract claim explicitly premised upon breach of oral contract to be precluded, in part, by New York statute of frauds); *Mui v. Union of Needletrades, Indus. & Textile Employees*, No. 97 Civ. 7270(HB), 1998 WL 513052, at *6–7 (S.D.N.Y. Aug. 19, 1998) (finding affirmative defense under New York statute of frauds to be appropriately raised in Rule 12(b)(6) motion to dismiss, as plaintiff alleged breach of two oral commitments and no allegation was made that those commitments were reduced to writing); *Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F.Supp. 838, 840–41 (S.D.N.Y.1987) (dismissing contract claim premised upon oral agreement under statute of frauds, despite complaint's ambiguity about contract's oral or written nature, because plaintiff's papers specified that agreement was oral); *Paper Corp. v. Schoeller Technical Papers, Inc.*, 724 F.Supp. 110, 115–16 (S.D.N.Y.1989) (holding in part, where plaintiff appended to its complaint those documents it contended contained the contract's essential terms, that statute of frauds partially barred plaintiff's breach of contract claim). Here, the LAB is more circumspect in its pleadings and its papers, leaving it an open question whether or not the acceptance it asserts was written or oral. The LAB hypothesizes in its papers that additional discovery will perhaps reveal a written acceptance that it does not currently have within its possession—a claim rejected by the Brokers, who point to the extensive amount of discovery already conducted in this and related cases, as well as the LAB's presumed access to all correspon-

dence sent to Askin or the Funds. Because written acceptance such as would satisfy the statute of frauds could exist without ever having been returned by the Brokers, the LAB counters, a signed, enforceable copy of the October letter may yet be found within the defendants' possession. *See Rail Europe*, 1996 WL 157503, at *4 n. 4 ("The Statute of Frauds does not mandate delivery, so it does not matter that defendant never returned the signed contract to plaintiff.") (*citing Transit Advertisers, Inc. v. New York, New Haven & Hartford R.R.*, 194 F.2d 907, 910 (2d Cir. 1952)).

Because the Complaint leaves unclear whether Merrill Lynch's or Bear Stearns' acceptance was written or oral, and because the LAB's papers do not commit the LAB to the position that the contract was oral, dismissal would not be appropriate at this juncture. The statute of frauds, though at times cognizable on a motion to dismiss where there is no real dispute as to the manner of acceptance, would not be appropriate grounds for dismissal in the instant case. *See In re Marceca*, 129 B.R. 371, 374 (Bankr.S.D.N.Y.1991) ("If, within the framework of the complaint, evidence may be introduced, such as a written agreement upon which the claim is based, which will sustain a grant of relief to the plaintiff, the complaint is sufficient.... In the instant case, it cannot be concluded from the face of the complaint that the agreement upon which plaintiff ... relies is not in writing, as required by the statute of frauds.") (*citing Sams v. United Food & Commercial Workers Int'l Union*, 866 F.2d 1380 (11th Cir.1989)); [14] *cf. Held v.*

14. Merrill Lynch and Bear Stearns have challenged the applicability of *In re Marceca*, given that a copy of a signed, written agreement was actually supplied in opposition papers by the plaintiff in that case. However, the *In re Marceca* court specifically rejected that plaintiff's attempt to supplement the pleadings with the written agreement. *See id.* at 374 ("[R]ichman ... proposes to prove that the agreement described in the Second Claim is reflected in a writing and forms the basis for

his claim.... However, this court will not consider matters outside the complaint in the context of Fed.R.Civ.P. 12(b)(6)."). The court also based its decision not on the written agreement, but on the conclusions that could be drawn from the face of the complaint. *See id.* ("Accordingly, apart from the fact that plaintiff, Richman, submitted a copy of the written agreement with his answering papers on this motion, the complaint sufficiently asserts a claim against the debtor and affords

*Kaufman,* 91 N.Y.2d 425, 433, 671 N.Y.S.2d 429, 433, 694 N.E.2d 430 (1998) (holding, despite plaintiff's submission of opposition affidavit clarifying that contract between plaintiff and defendant was in fact oral, that dismissal of contract-based claim for fraud in the inducement would not be appropriate under N.Y. C.P.L.R. 3211; explaining that "[a]lthough plaintiff ultimately will have the burden to submit evidentiary facts taking the agreement outside the Statute of Frauds ... we must credit the assertions in plaintiff's surreply papers suggesting certain factual grounds which may defeat the Statute of Frauds defense."); *Luckel v. Kolinsky,* 160 A.D.2d 1172, 1173, 554 N.Y.S.2d 374, 375 (3d Dep't 1990) ("As to defendant's argument that the Statute of Frauds bars plaintiff's action, dismissal should not result for that reason [under N.Y. C.P.L.R. 3211] unless it can be said that no significant dispute exists as to the sufficiency of the memoranda that satisfies the Statute of Frauds.") (citations omitted).

At some juncture—perhaps in the not-too-distant future—the LAB may of course need to do much more than simply allege a "communication" of acceptance by Bear Stearns or Merrill Lynch. Even setting aside the Brokers' contentions regarding New York's statute of frauds, the very terms of the October letters appear to demand acceptance in writing.[15] However, for the time being the LAB's contract claims against Merrill Lynch and Bear Stearns withstand this line of attack.

### C. *Adequacy of Consideration*

■ Under New York law, a contract unsupported by consideration is generally invalid. If the promisor loses nothing, and the promisee acquires nothing by an arrangement, then there is no valid consideration. *See Kinley Corp. v. Ancira,* 859 F.Supp. 652, 657 (W.D.N.Y.1994) *(citing Manufacturers Hanover Overseas Capital Corp. v. Southwire Co.,* 589 F.Supp. 214, 219 (S.D.N.Y.1984)).

■ Sufficient consideration, however, may be provided either by a benefit to a promisor or a detriment to the promisee. *See Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 196–97, 443 N.E.2d 441, 444 (1982). As the New York Court of Appeals explained in *Weiner,* " '[i]t is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him.' " *Id. (quoting Hamer v. Sidway,* 124 N.Y. 538, 545, 27 N.E. 256, 257 (1891)).

■ Under traditional principles of contract law, the parties to a contract are entitled to make their own bargain, "even if the consideration exchanged is grossly unequal or of dubious value." *Apfel v. Prudential–Bache Sec. Inc.,* 81 N.Y.2d 470, 475, 600 N.Y.S.2d 433, 435, 616 N.E.2d 1095, 1097 (1993). "Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee." *Weiner,* 57 N.Y.2d at 464, 457 N.Y.S.2d at 197, 443 N.E.2d at 445. However, "[n]either a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration." *Tierney v. Capricorn Investors, L.P.,* 189 A.D.2d 629, 631, 592 N.Y.S.2d 700, 703 (1st Dep't 1993); *see FDIC v. Hyer,* 66 A.D.2d 521, 529, 413 N.Y.S.2d 939, 944 (2d Dep't 1979) (same).

■ The Brokers contend that any agreements premised upon the October letters are void for want of consideration,

him an opportunity to present any objections, including the statute of frauds defense.").

**15.** The letter to Bear Stearns states: "Please acknowledge your receipt of and agreement with the terms of this letter by signing in the space provided below. You may return it to us either by mail or by fax." (de Leeuw Decl. Ex. 6.) At the bottom of the letter text appears a signature line with the caption "I am in agreement with the terms of this letter." *Id.*

as the language of those letters was merely precatory and neither a detriment nor a benefit of legal consequence were ever exchanged. At most, the Brokers contend, the letters were non-binding requests for accurate marks—and any "acceptances" non-binding statements of future intention.

To be sure, the October letters were not drafted in the clearest terms possible. The Brokers observe that Askin's caution that the amount of business done with the Brokers would be "reduce[d] significantly" if marks were not provided is problematic, because Askin would not necessarily be obligated to continue doing business with the Brokers on the Funds' behalf, agreement on the terms of the October letter notwithstanding. The Brokers also make much out of the letters' statement that Askin would "like" mark sheets to be provided, characterizing the letters merely as "requests" for gratuitous compliance.

There are a number of potential approaches to the complex contractual issues presented in this case, but the Court is unable to say that any contracts formed pursuant to the October letters were necessarily invalid for want of consideration.

One plausible approach towards the October letters, which reads any agreements formed pursuant to the letters in light of the preexisting relationships between the Funds and the Brokers, finds consideration for an agreement in the actual benefits received by the Brokers as a result of later transactions and purchases of securities. Included in these benefits were substantial payments to the Brokers, as well as the benefits flowing from the Funds' purchases of deal-driving tranches of securities. Under this analysis, the actual consideration provided to the Brokers would be the same as that furnished under the pre-letter arrangements between the parties. While the Funds were always free to take their business elsewhere, and the Brokers were entitled to cease doing business with the Funds, transactions were to be governed by the terms of all agreements conditioning those transactions, including any customer or repo agreements.

A second approach to the October letters is to find consideration in the Funds' actual forbearance from reducing their business with the Brokers. While the Funds were of course free to take their business elsewhere, despite the terms of the October letters, their forbearance from doing so would certainly constitute a detriment.

Still another approach to the consideration issues raised by the Brokers—though one not specifically mentioned by any of the parties to the instant litigation—would be to find that consideration was not required at all, assuming that the October letters merely effected a modification of preexisting contracts between the Funds and the Brokers, and that the modification was in writing. Under New York law, a written, signed agreement to discharge or modify an existing obligation is not rendered invalid because of the absence of consideration. *See* N.Y. Gen. Oblig. Law § 5–1103 (McKinney's 1989); *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 21 (2d Cir.1974); *Mega–Trends Int'l, Inc. v. Beeba's Creations, Inc.*, No. 93 CIV. 8227(JSM), 1995 WL 322153, at *3 (S.D.N.Y. May 26, 1995); *GG Managers, Inc. v. Fidata Trust Co. New York*, 215 A.D.2d 241, 241–42, 626 N.Y.S.2d 488, 490 (1st Dep't 1995).

In its papers, Bear Stearns has specifically contended that because Bear Stearns' customer agreements with the Funds do not allow for modifications of the business relationship between the parties "absent a written instrument signed by an authorized representative of Bear Stearns," (de Leeuw Decl. Ex. 7), the LAB's failure to allege the existence of a written acceptance of the October letter requires dismissal. If, as Bear Stearns suggests however, the October letter could merely have *modified* the terms of the extant agreement(s) between Bear Stearns and the Funds, any acceptance in writing would then have brought the modifications within

the ambit of section 5–1103. *See Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, Inc.*, 579 F.Supp. 1420, 1430 (E.D.N.Y.1984). While the absence of written modification might ultimately merit dismissal given the terms of underlying customer agreement(s), the existence of such a writing would redound to the LAB's benefit and render unnecessary any additional consideration.

The LAB has suggested that any agreements premised upon the October letters are analogous to the generic customer agreements commonly used to govern relations between brokers and their clients. Alternatively, the LAB has analogized any agreement to other forms of binding agreements premised upon relationships that are terminable at-will—namely, at-will employment relationships where forbearance from either quitting or firing itself supplies the consideration for secondary contracts, such as contracts not to compete. These are useful, if imperfect, analogies.

Under most brokerage customer agreements, neither the customer nor the broker is obligated to transact any specific amount of business with the other. If the client comes to realize that its investment needs are better met by using another broker, client and broker typically part ways without any contractual cause of action arising. If that client happens to purchase a security through that broker, however, there is little question but that the customer agreement is enforceable and that the transaction is governed by the terms of that agreement—consideration having been provided both by the maintenance of a customer account and by the exchanges of rights, benefits, and obligations flowing from the specific transaction itself. This analogy is quite close to the first approach discussed above. The consideration conferred, given this approach, was emphatically not *more* purchases or an *unreduced* amount of purchases, but rather purchases simpliciter

and the other exchanges of rights and obligations those purchases entailed.

The LAB's comparison of the October letters to contracts formed attendant to at-will employment contracts is also a useful analogy, given the second approach to consideration stated above. In a number of cases, both within and without New York, courts have found that consideration for a contract may be supplied by actual forbearance from exercising one's rights to unilaterally cancel a contract terminable at will; even though there was no obligation to continue the at-will relationship in the first instance. *See Taylor v. Blaylock & Partners, L.P.*, 240 A.D.2d 289, 290, 659 N.Y.S.2d 257, 259 (1st Dep't 1997); *Barger v. General Elec. Co.*, 599 F.Supp. 1154, 1161 (W.D.Va.1984) ("[A]n employee's continued service and his failure to exercise his power to terminate his employment is sufficient consideration for an additional promise by the employer which modifies the terms of the employment contract."). Forbearance, these decisions indicate, can constitute consideration, even where the forbearing party is not contractually obligated to refrain from exercising its rights. *See Taylor*, 240 A.D.2d at 291, 659 N.Y.S.2d at 259 ("[B]ecause plaintiff's employment was terminable at will, defendant can also be said to have given consideration by forgoing its right of termination under the contract (*Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256 [forbearance from exercising a right constitutes consideration] )."); *Foley v. Pac Am Or Bearing, Inc.*, 105 A.D.2d 1120, 1120, 482 N.Y.S.2d 605, 605 (4th Dep't 1984) (finding alleged oral modification of contract enforceable "because it was supported by the consideration of defendant's forbearance in promising to employ plaintiff between 1978 and 1981") (citations omitted).

The Brokers have made much of the fact that the October letters did not themselves obligate the Funds to do anything, or set a terminus for the provision of marks. However, the Brokers' emphasis on the absence of any requirement that the

Funds actually maintain their business with the Brokers overestimates the consideration actually required to form a valid contract. It is consideration that is required to form a contract under New York law, not rigorous reciprocity or mutuality. *See Weiner,* 57 N.Y.2d at 464, 457 N.Y.S.2d at 196, 443 N.E.2d at 444. Though any contracts formed pursuant to the October letters certainly did not demand that the Funds continue to transact business with the Brokers, the Complaint alleges that they did so. If the Funds or their advisor actually forbore reducing their purchases from the Brokers and increasing their business with other brokers as a result of agreements pursuant to the October letters, then consideration was adequate. While Merrill Lynch has made the point that any forbearance on the part of the Funds could not provide consideration for contracts between the Brokers and Whitehead/Sterling, and the DLJ defendants have stressed that the October letter "stands alone, ancillary to no other arrangement," (DLJ Reply Mem. Supp. Mot. Part. Dismiss at 10), as explained earlier regarding standing it is entirely possible that Askin was functioning in his capacity as an agent of the Funds when he sent the October letters. Given this possibility, it would not be proper to view the October letters in a vacuum.

Moreover, the Complaint alleges that the Funds and the Brokers' continued to transact business well after the October letters were sent. To the extent that the October letters could be read to merely add terms to the pre-existing relationships between the Funds and the Brokers, the consideration for any agreement would be supplied by post-letter transactions and the real benefits those transactions imparted to the brokers—benefits that the Funds were not under any preexisting duty to provide. At the very least, one could read the October letters as giving rise to transaction-specific obligations, requiring the Brokers to supply accurate and updated marks for all securities purchased by the Funds subsequent to agreement on the letters' terms. It is worth mentioning at this juncture then-judge Cardozo's observation in *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917), that "[a] promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." *Id.* at 91, 118 N.E. 214 (citations omitted).

*Liebowitz v. Elsevier Science Ltd.,* 927 F.Supp. 688 (S.D.N.Y.1996), upon which the Brokers rely, does not require a different result. In *Liebowitz,* a case involving several disputes between parties that had contracted to publish scientific journals, the plaintiffs alleged that one plaintiff had requested that the defendant prepare periodic status reports containing information about production schedules, manuscript flow, and page budgets, and that the defendant agreed to do so orally. *See id.* at 702 & n. 24. These reports were not called for by an earlier contract governing the relationship between the parties. *See id.* at 703. Holding that the defendant's alleged agreement to provide status reports was not supported by any consideration whatsoever, the court observed that the agreement sought to impose a continuing obligation upon the defendant without any corresponding benefit to the plaintiff. *See id.*

Setting aside the *Liebowitz* court's failure to explicitly mention that a bargained-for detriment to the promisee could also supply consideration, the facts of that case afford ample grounds for distinguishing that decision. While the fact that the *Liebowitz* case involved an agreement to provide status reports supplemental to the parties' earlier agreement makes it superficially similar to the case at bar, in which the Brokers are also alleged to have agreed to provide the Funds with supplemental information concerning marks, the case is not analogous. In that case, there was no claim that the plaintiffs engaged in any forbearance whatsoever based upon the defendant's agreement to provide status reports. Indeed, though it concerns a

slightly different point, the *Liebowitz* court explicitly noted that the plaintiffs had not relied to their detriment upon the defendant's oral agreement to provide status reports.

Moreover, the pre-existing contractual relationship between the parties in *Liebowitz* was markedly different from that between the Brokers and the Funds in this case. In *Liebowitz*, the earlier contract between the parties had governed multiple aspects of an ongoing publishing relationship, rather than a series of discrete transactions. This is quite different from the contractual arrangements at issue in the case at bar, where the Funds were at all times free to cease purchasing securities from the Brokers, but those transactions in which they *were* involved were to be governed by a particular set of contractual agreements.

Consequently, dismissal of this claim would not be appropriate at this time based upon inadequacy of consideration. Refusal to agree to the terms of Askin's October offer may not have eliminated all business relations between the Funds and resisting Brokers. It was within the Brokers' rights to gamble that business would not decline significantly, and to keep their original agreements with the Funds unaltered by any supplemental agreements. However, if the Brokers agreed to supply certain marks as part of their future relationship with the Funds, and the Funds either engaged in forbearance because of that agreement or participated in transactions conditioned by the letters' terms,[16] consideration was supplied. The LAB's contract claims premised upon the October letters neither assert a promise to do that which the LAB was already bound to do, nor are they based upon the performance of any preexisting legal obligation. Finally, to the extent that the Brokers agreed in writing to a modification of the Brokers'

customer agreement(s), or to any other contracts governing the Broker–Fund relationships, consideration would not be required at all.

### D. *Miscellanea*

The Brokers' other varied and sundry grounds for dismissal of Count III are rejected as well.

Bear Stearns contends that, even had a contract been formed pursuant to the October letter, Bear Stearns' failure to provide certain information required by that letter manifested Bear Stearns' termination of the contract. However, this line of attack depends almost exclusively on monthly mark sheets, attached as exhibits to Bear Stearns' papers, that cannot be appropriately considered on a 12(b)(6) motion.

The DLJ defendants have alleged that the LAB's continued purchase of securities from DLJ, even though DLJ provided a second set of marks between October of 1992 and February of 1994, constituted a waiver of the Funds' rights to enforce any contract. However, as with the Bear Stearns defendants' contentions regarding termination, this waiver claim cannot be determined within the four corners of the Complaint or exhibits appropriately considered on a motion to dismiss, and would not be appropriate grounds for dismissal.

▋ Additionally, that the October letters do not themselves contain an explicit time-frame for the Brokers' performance—other than a recitation that the letters shall be "effective October 1992"—does not merit dismissal. The fact that the agreements alleged do not contain a specified time for performance does not constitute a form of indefiniteness that would warrant dismissal at this pleadings stage. *See Held*, 91 N.Y.2d at 432, 671

---

**16.** As a general rule, even a contract unenforceable at its inception because of lack of consideration or mutuality "may nevertheless become valid and binding to the extent that it has been performed." *Howard v. Mercury*

*Record Corp.*, 178 F.2d 449, 453 (5th Cir. 1949) (*citing Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923)).

N.Y.S.2d at 433, 694 N.E.2d 430. Moreover, the terms of a contract need not be fixed with absolute certainty for a contract to have legal efficacy. *See* Restatement (Second) of Contacts § 33, cmt. a (1981) ("[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon."). Certain terms of a contract may be supplied by the parties' prior course of dealings. *See New Moon Shipping Co. v. Man B&W Diesel Ag,* 121 F.3d 24, 31 (2d Cir.1997). The time-frame for performance may later be revealed by documents or papers not considered by the Court upon this motion to dismiss, or by interpretation of the October letters' terms in light of prior dealings among the parties. *See Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir.1977) ("Professor Corbin has observed that a court should be slow to deny enforcement 'if it is convinced that the parties themselves meant to make a "contract".... Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and that is more just to both of them than would be a refusal of enforcement.'") (*quoting* Corbin on Contracts § 97, at 425–26).

The DLJ defendants' claims that the LAB fails to allege that DLJ actually breached any obligations created by the October letter are also rejected. DLJ has asserted that the LAB has only alleged that the LAB breached the October letter by superseding its initial month-end mark reports with revised reports containing different marks, and that nothing in the Complaint indicates that its initial month-end marks were accurate. Even if the revised marks were somehow inaccurate, DLJ contends, DLJ performed its obligations under the precise terms of the October letter. However, the Complaint alleges that DLJ actually "superseded" the marks provided in its initial month-end price reports with the revised and inaccurate marks, and that the revised marks were also transmitted on month-end price report forms. Compl. ¶¶ 125–26. The Complaint also states that DLJ confirmed the accuracy of the revised marks in response to Price Waterhouse's request that DLJ confirm the accuracy of its December 1992 and 1993 month-end marks. Compl. ¶ 127. There is therefore no bright-line distinction to be made, on the face of the Complaint, between the revised marks and the marks DLJ may have been obligated to provide pursuant to the October letter—insofar as the LAB's contract claim against DLJ is concerned. DLJ strains excessively and unsuccessfully to parse the terms of the October letter, but the Complaint sufficiently alleges a breach on DLJ's part.

Given the above holdings, the Court need not reach the parties' disputes concerning "part performance." The Brokers' motions to dismiss the LAB's claim for breach of contract contained in Count III of the Complaint are denied.

## IV. *Count IV Against DLJ and Comerford Alleging Common Law Fraud is Dismissed*

As was explained in *Granite II,* 17 F.Supp.2d at 286, there are five basic elements necessary to sustain a claim of fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *See May Dep't Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987); *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995). Additionally, a plaintiff must comply with the heightened pleading standard of Rule 9(b), Fed.R.Civ.P.

In Count XIII of its First Amended Complaint, the LAB alleged that the Brokers misrepresented certain securities, particularly inverse IOs, as bearish or only

slightly bullish when, in fact, they were strongly bullish or their reaction to interest rate changes was impossible to predict. In reliance on the Brokers' misrepresentations, the LAB contended, the Funds bought securities that they would not otherwise have purchased, and they held onto securities that they would otherwise have sold. In *Granite II,* these fraud claims were dismissed, in part because the LAB had not adequately pleaded reasonable reliance. 17 F.Supp.2d at 288–91.

■ Count V of the LAB's current Complaint specifically alleges that DLJ and Comerford provided erroneous marks to the Funds, "impliedly represent[ing] that the marks were accurate when DLJ and Comerford knew that the marks were inaccurate or recklessly disregarded whether they were accurate or inaccurate." Compl. ¶ 232. The motive for this provision of inaccurate marks were DLJ and Comerford's desires that the Funds purchase volatile "deal driving" tranches of DLJ's CMO offerings, Compl. ¶¶ 38, 233, the sale of which was a prerequisite to the sale of the remainder of the tranches. *See* Compl. ¶ 5. According to the Complaint, the "Funds were unaware of the falsity of DLJ's and Comerford's statements [regarding the marks] and justifiably relied upon them in valuing their portfolios, in purchasing certain securities, and in not selling various inverse IOs and other securities." Compl. ¶ 235. Conversely, both DLJ and Comerford are alleged to have been well aware "that the Funds relied on the CMO prices or 'marks' that the Brokers reported, so that the Funds and their investors could assess how the portfolios as a whole and particular CMOs were reacting to, and would react to, changing interest rates, as well as to determine if the Funds were conforming to their stated investment objectives." Compl. ¶ 50.

More specifically, the LAB alleges that: DLJ provided the Funds with marks that did not accurately reflect DLJ's internal valuation of the securities. In every month between October 1992 and February 1994, DLJ provided the Funds with two sets of marks. DLJ provided an initial month-end price report, but DLJ also superseded that report with a revised report that contained inaccurate revised marks.

Compl. ¶ 125. These revised marks are alleged by the LAB to have been inaccurate, and to have been prepared without any input whatsoever from DLJ's mortgage traders as to the value of the securities held by the Funds. Compl. ¶ 128. In its Complaint, the LAB points to a number of occasions on which the revised marks provided by DLJ differed from DLJ's initial marks. *See* Compl. ¶¶ 129–35. According to the LAB, the inaccurate marks caused a myriad of problems for the Funds—including "distorting their ability to understand their portfolios and determine whether the portfolios were being maintained in a manner consistent with their stated investment objectives," Compl. ¶ 136, and "leading the Funds to retain [bullish] … securities in their portfolios when they otherwise would have sold them." Compl. ¶ 137.

Despite the LAB's catch-all allegation that the Funds relied upon DLJ's statements regarding marks, however, the LAB never ventures to actually plead facts that underlie this reliance. The LAB's essential claim of misrepresentation revolves around DLJ's provision of erroneous "revised" marks. However, the LAB alleges only on information and belief that "the Funds understood that DLJ's revised marks represented DLJ's actual revised valuations of the bonds …. [and] reasonably and justifiably relied on these revised marks as representing DLJ's actual valuations of the bonds." Compl. ¶ 126.

"Fraud pleadings generally cannot be based on information and belief." *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988). The exception to this rule is that "fraud allegations may be so pleaded as to facts peculiarly within the opposing party's knowledge; even then, however, the allegations must be accompanied by

a statement of facts upon which the belief is founded." *Id.; see Campaniello Imports Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997); *see also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) ("This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").

The LAB's "information and belief" pleadings concerning the Funds' reliance upon DLJ's revised marks are insufficient. The Funds' reliance on the marks is not a matter "peculiarly" within the defendants' knowledge, as it must for a fraud pleading premised on "information and belief." *See Campaniello Imports*, 117 F.3d at 664. Indeed, the Funds themselves are better positioned than anyone else to know what their actual reliance was. The LAB's common law fraud claim against DLJ and Comerford could therefore be dismissed for failure to meet the specificity required by Rule 9(b) alone.

Even were the LAB's pleadings not found wanting under Rule 9(b), however, its allegations of reasonable reliance would be insufficient to state a claim under New York law. Though the LAB's claim in Count IV is distinct from Count XIII of the First Amended Complaint, dismissal is appropriate under a similar line of reasoning.

■ Under New York law, the LAB must establish actual, direct reliance upon the marks supplied by DLJ. *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir.1991); *Belin v. Weissler*, No. 97 Civ. 8787, 1998 WL 391114, at *5 (S.D.N.Y. July 14, 1998); *Turtur v. Rothschild Registry Int'l, Inc.*, No. 92 Civ. 8710(RPP), 1993 WL 338205, at *6 (S.D.N.Y. Aug. 27, 1993). Once allegations of actual, direct reliance are adequately pleaded, however, the reliance inquiry does

not stop. Under New York law, "the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 157 N.E.2d 597, 599–600, 184 N.Y.S.2d 599, 603 (1959); *see Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *Palmadessa*, 874 F.Supp. at 588.

■ Though the LAB has contended otherwise, whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss. *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032–33 (2d Cir.1993); *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.*, 919 F.Supp. 149, 154–55 (S.D.N.Y.1996).

■ In evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider, *inter alia*, the plaintiff's sophistication and expertise in finance, the existence of a fiduciary relationship, and whether the plaintiff initiated the transaction. *See Brown*, 991 F.2d at 1032. A party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions. *See Abrahami v. UPC Constr., Co.*, 224 A.D.2d 231, 234, 638 N.Y.S.2d 11, 14 (1st Dep't 1996); *see also Belin*, 1998 WL 391114, at *5–8. Reasonable reliance may be found wanting where the plaintiff failed to conduct its own diligent research into the risks or benefits of a particular transaction. *See Independent Order of Foresters*, 919 F.Supp. at 154; *McCoy v. Goldberg*, 883 F.Supp. 927, 936 (S.D.N.Y.1995). Sophisticated parties may well be under a duty to make affirmative efforts to protect themselves from misrepresentations, *see Lazard Freres*, 108 F.3d at 1543, and cannot be heard to complain when they fail to make diligent inquiries. *See Oatar Nat'l Navigation & Transp. Co.*

*v. Citibank, N.A.,* No. 89 Civ. 464(CSH), 1998 WL 516117, at*24–25 (S.D.N.Y. Aug. 20, 1998), *aff'd,* No. 98–9322, 1999 WL 464987 (2d Cir. June 29, 1999).

Just as *Granite II* held that no reasonable investor could rely solely on short-hand phrases like "bullish" or "bearish" in selecting complex CMOs and mortgage-backed securities, 17 F.Supp.2d at 290, *no reasonable investor could rely solely on month-end valuations or portfolio analyses made after the purchase without conducting some independent due diligence*—let alone valuations provided solely by DLJ. The LAB's allegation that the Funds' reliance on DLJ's marks was reasonable is insufficient in light of ACM's own obligations to research and evaluate the Funds' holdings. While the LAB now contends that the marks provided by DLJ to the Funds were somehow integral to ACM's own analysis, this would not itself relieve the Funds from their obligations to independently value their portfolios. The very purpose of the investment advisory agreements was for the Funds to have ACM evaluate, select, and monitor the Funds' holdings, in addition to the multiple other services ACM was supposed to provide. The LAB nowhere contends that the Funds' receipt of DLJ's marks somehow satisfied the Funds' duties to conduct their own due diligence.

Even assuming that the marks DLJ provided were deliberately false, justifiable reliance has once again been insufficiently pleaded. Though the LAB has conveniently omitted various details of ACM and Askin's duties and breaches that were explicitly relied upon in *Granite II*,[17] the Complaint itself still militates against any

conclusion that the Funds' wholesale reliance on DLJ's marks was reasonable. As the Complaint states, it was the duty of Askin and ACM, among other things, "to construct portfolios of low-risk, high-quality securities for Corp. and Partners that were market neutral, so as to eliminate risks resulting from interest rate movements, and to construct a portfolio for Quartz that was market directional without exposing Quartz to excessive interest rate risk." Compl. ¶ 77. ACM and Askin were also "responsible for continually monitoring each of the Funds' portfolios and for adjusting the portfolios by purchasing and selling appropriate securities." Compl. ¶ 77. Despite this responsibility, the Complaint alleges that "ACM and Askin did not possess or employ adequate analytic models, did not understand how certain CMOs, particularly inverse IOs, would react to changes in interest rates, and were unable to determine the effective duration of the Funds' portfolios." Compl. ¶ 85. The Complaint also alleges that ACM "did not have the capacity to determine, at the time it committed to purchase, whether [forward-settling] ... CMOs would be consistent with a market neutral (or even a directional) strategy, which made them inappropriate for the Funds' portfolios." Compl. ¶ 108.

Askin and ACM were not widows or orphans, and they cannot be held to the standard of an ordinary investor in terms of the type and amount of diligence that would be expected prior to making a purchase or investment. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997) ("The parties involved

---

**17.** For example, the Complaint omits any allegation that Askin and ACM "had committed themselves to making extensive use of proprietary computerized models to analyze CMOs by modeling cash flows, prepayment expectations, and yields across numerous interest rate scenarios." (*Id.* ¶ 67.) The Complaint also omits other details of ACM's nonfeasance, a catalogue of which is unnecessary. Because an amended pleading supersedes the original pleading, facts not incorporated

in the amended pleading are generally considered *functus officio. See Kelley v. Crosfield Catalysts,* 135 F.3d 1202, 1204–05 (7th Cir. 1998); *Barris v. Hamilton,* No. 96 CIV. 9541(DAB), 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999). This being the case, the LAB's prior allegations have not been relied upon in deciding the instant motions to dismiss.

in this litigation are not widows or orphans. Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'") (*quoting Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984)). The Funds collectively possessed close to $400 million in assets in March 1994, *see* Compl. ¶ 7, and invested in highly complex and high-risk securities. Indeed, the LAB alleges that the Funds invested in especially volatile or "toxic" CMO tranches, *see* Compl. ¶ 14, and that the response of certain of those CMOs to interest rate fluctuations was difficult to predict. *See* Compl. ¶ 36.

The very purpose of the investment advisory agreements between ACM and the Funds was for the Funds to have Askin and ACM evaluate and monitor the Funds' holdings. "By virtue of its position as registered advisor to and manager of the Funds," ACM owed fiduciary and contractual duties to the funds to "make investments prudently, with due care, and in accordance with the Funds' stated investment objectives." Compl. ¶ 76. These duties were breached by ACM. Instead of keeping their obligations to the Funds, Askin and ACM instead relied on Broker "recommendations, representations, valuations, and reports and they ... exposed the Funds to near-complete 'market'—*i.e.*, Broker—control." Compl. ¶ 79. Despite the LAB's internally inconsistent claim that Broker marks were somehow required to meet ACM's advisory obligations, *see* Compl. ¶ 77, this reliance constituted a wholesale abdication of ACM's responsibilities—ACM and Askin's "analytic weaknesses" notwithstanding. Compl. ¶ 85.

Just as this lack of due diligence was held in *Granite II* to belie any representation that Askin's reliance on February marks or DLJ's September 1993 valuation was justifiable or reasonable, *see* 17

F.Supp.2d at 290–91, this lack of due diligence belies the reasonableness of any reliance that the Funds may have had on the accuracy of the marks supplied by DLJ. Try as the LAB might, it cannot transform wholesale breaches of duty by the Funds' investment advisor into a claim against a broker selling the Funds securities at arm's length. Thus, Count IV of the Complaint is dismissed.

## V. *The LAB Has Not Adequately Alleged Common Law Fraud, Based on the Brokers' Sale of Securities to the Funds at Excessive Markups (Count V)*

In Count V of the Complaint, the LAB has asserted a claim for common law fraud based on the Brokers' alleged sale of securities to the funds at excessive markups. This claim was not present in the First Amended Complaint, and was therefore not addressed in *Granite II*.

The gravamen of this particular claim is that the Brokers sold CMO securities to the Funds at prices well in excess of either the prices at which the Brokers had obtained those instruments or the values that the Brokers had themselves assigned to the securities. The LAB claims that the Brokers passed these markups along to the Funds without full disclosure, and that the dealer-customer relationship between the Funds and the Brokers gave rise to an "implied representation that the prices they charge are reasonably related to the fair market prices of the securities offered for sale." Compl. ¶ 240. The LAB contends that the Funds were themselves unable to discover the markups prior to 1998, as it was only then that the Funds had access to the true acquisition costs of the bonds sold to the funds. The LAB further contends that the Funds would not have purchased securities sold at such extensive markups had those markups been disclosed.

In support of its claim, the LAB has offered multiple examples of CMOs that it believes were sold to the Funds at exces-

sive markups. DLJ is alleged to have sold at least fifteen CMOs at prices well above their fair market price, recouping markups ranging from 3.5% to 36.7%. Compl. ¶ 115. Bear Stearns is alleged to have sold the Funds at least nine CMOs at excessive markups, ranging from 3.7% to 13.4%. Compl. ¶ 116. Merrill Lynch is alleged to have sold at least two CMOs to the Funds at prices between 5.8% and 8.5% above their fair market value. All of the Brokers are claimed to have recovered significant profits as a result of these markups.

As the Brokers have correctly contended, Count V of the Complaint is essentially a "shingle theory" claim. The claim is that, as brokers selling securities, the defendants impliedly represented that the prices they charged the Funds for mortgage-related securities bore some reasonable connection to the fair market value of those securities or the price at which the Brokers obtained the securities. When a broker hangs out her "shingle" and does business with the public, the argument goes, the broker implicitly represents that customers will be dealt with fairly and cannot exploit the customer's trust and ignorance for profits higher than those that might be realized from an informed customer. *See In re Duker & Duker*, 6 S.E.C. 386 (1939); *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 437–38 (2d Cir.1943); 8 Louis Loss & Joel Seligman, Securities Regulation 3776–77 (1991).

■ Over the past six decades, the shingle theory has provided a remedy against brokers under federal law—first to Government regulators and, later, to injured customers bringing private actions. Under the shingle theory, a broker-dealer who sells a security without disclosing that the price at which he is selling is not reasonably related to the current fair market price of the security violates the antifraud provisions of the federal securities laws—namely section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, and section 17(a) of the Securities Act of 1933. *See, e.g.,*

*Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 189–90, 192–93 (2d Cir.1998); *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1469 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *Charles Hughes & Co.,* 139 F.2d at 437–38; Loss & Seligman, *supra,* at 3772–98. As the Second Circuit observed in *Grandon,* the Supreme Court "has a rich tradition of interpreting the antifraud provisions of the federal securities laws expansively." 147 F.3d at 192. The shingle theory is an outgrowth of that general tradition, and has been expanded over the years to cover excessive markups of a wide variety of securities:

> We have held previously that sales of securities by broker-dealers carry an implied representation that the prices charged are reasonably related to the prices charged in an open and competitive market. *First Jersey,* 101 F.3d at 1469 (citing *Charles Hughes & Co.,* 139 F.2d at 437). Moreover, we have held that "a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws." *First Jersey,* 101 F.3d at 1469. True, our decision in *First Jersey* was in the context of an SEC enforcement action regarding excessive markups on over-the-counter securities. The time has come, however, to extend the *First Jersey* principles to private actions arising out of excessive markups on municipal bonds.

*Id.* at 193. A considerable amount of attention has been devoted by both the courts and regulators to evaluating the reasonableness of markups in the sale of securities, as appropriate markups may vary depending on the market, the position of the broker, and the types of securities involved. *See generally* 3C Harold S. Bloomenthal, Securities and Federal Corporate Law § 12.13 (1997) (discussing calculation of appropriate dealer markups and markdowns); Anthony W. Djinis & Lee A. Pickard, Fair Prices: Markups,

Markdowns and Guidelines for Determining Current Market Price, 744 PLI/Corp 239 (1991) (same); *Grandon,* 147 F.3d at 193 (holding that, in assessing whether markups on municipal bonds are excessive, "courts should begin with the factors set forth under MSRB (Municipal Securities Rulemaking Board) Rule G–30."); *Banca Cremi v. Alex, Brown & Sons, Inc.,* 132 F.3d 1017, 1033 (4th Cir.1997) ("Although each case requires an independent analysis for determining whether a given markup is reasonable, the Board of Governors of the NASD has determined that, as a general guideline, a five percent markup is reasonable.").

However, the LAB's excessive markup claim has not been brought pursuant to section 10(b), Rule 10b–5, or any other federal law or regulation, but rather is a common law claim alone. A claim under the federal securities laws was not brought, perhaps, as a result of the time limits articulated by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (holding that statute of limitations for section 10(b) claims is one year from date of discovery, but no longer than three years from the date of the alleged fraud). The LAB claims that New York law affords the Funds relief for common law fraud, as New York recognizes that omissions as well as misrepresentations may give rise to a claim for fraud. Nevertheless, neither the parties' memoranda nor this Court's independent research have revealed any explicit New York authority supporting a common law fraud claim based upon the shingle theory, let alone a shingle theory claim for excessive broker markups.

 It is true that New York law allows recovery for frauds based upon omissions, conduct, or speech that are tantamount to false representations. *See Banque Arabe et Internationale v. Maryland Nat'l Bank,* 57 F.3d 146, 153, 155 (2d Cir.1995); *Minpeco v. ContiCommodity Servs., Inc.,* 552 F.Supp. 332, 336 (S.D.N.Y.1982) (collecting cases). As the Second Circuit explained in *Brass v. American Film Tech.,* 987 F.2d 142 (2d Cir.1993):

> New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."

*Id.* at 150 (*quoting Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984)) (citations omitted); *see Banque Arabe,* 57 F.3d at 155.

 The LAB has not alleged that the Brokers made partial or ambiguous statements concerning markups, or that the Brokers gave a less than truthful answer to any Fund's questioning about the extent of markups, but rather that the Brokers made no statements about markups at all. Furthermore, the Brokers did not have discretionary authority over the Funds' holdings, and owed no fiduciary duties to the Funds under New York law such as would give rise to a duty of disclosure. Under ordinary circumstances a broker owes no fiduciary duties to a purchaser of securities, *see Perl v. Smith Barney Inc.,* 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (1st Dep't 1996), except those duties necessarily attendant to the "narrow task of consummating the transaction requested." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 536 (2d Cir. 1999) (citations omitted). The fact that the Funds allege excessive markups does not change this basic analysis. *Cf. Press,* 166 F.3d at 536–37 (finding no claim for failure to disclose markups given nature of broker-customer relationship under New York

law, as no case law applying New York's fiduciary requirements supports broad proposition that all markups must be disclosed).

The LAB has pressed that the Brokers' charging of excessive markups gave rise to an affirmative obligation to disclose, because the brokers were in possession of superior knowledge concerning the market value of the securities it was selling the Funds. This begs the question, however, as to the real representation(s) inferred under New York law when a broker sells a security. Under the Federal securities laws, the representation of reasonable pricing is inferred. However, the shingle theory has not developed as a generic theory of fraud liability based upon omissions, but rather a specific theory of recovery under the federal securities laws.[18] A review of the cases cited by the LAB in support of its position reveals facts and circumstances rather dissimilar from those of the case at bar. *See, e.g., Minpeco*, 552 F.Supp. at 334–37 (brokers' failure to disclose fact that increase in global price of silver was result of broker defendants' own conspiracy to monopolize silver market could constitute fraud under New York law, where brokers were alleged to have actively induced plaintiff to enter into futures contracts for short sales of silver); *Donovan v. Aeolian Co.*, 270 N.Y. 267, 272, 200 N.E. 815, 817 (1936) (placement of used piano for sale in piano manufacturer's showroom, without indicating it as such, could constitute fraud; acts of manufacturer and words of salesman "may be regarded as an affirmation that the piano was taken out of stock and unused.").

The only two cases cited by the LAB that remotely support its position, *Farley v. Baird, Patrick & Co.*, No. 90 Civ. 2168(MBM), 1995 WL 498785 (S.D.N.Y. Aug. 22, 1995), and *Manela v. Garantia Banking Ltd.*, 5 F.Supp.2d 165 (S.D.N.Y. 1998), did not specifically address New York's embrace of the shingle theory. In *Farley*, the plaintiff had brought both federal securities claims and state common law claims, in addition to a RICO claim under 18 U.S.C. § 1962, based on allegations of overcharges for commissions on purchases of over-the-counter stock. Despite dueling motions for summary judgment, the *Farley* court held that summary judgment was not appropriate as to plaintiff's section 10(b), Rule 10b–5, and state law claims—as there were significant questions remaining as to the actual extent of markups charged. *See* 1995 WL 498785, at *1 ("The threshold factual issue underlying both parties' motions is the extent of the markups ... charged plaintiff for the PSI and Hybrilonics shares. Without dispositive findings on this issue, summary judgment is inappropriate because plaintiff's federal and state law claims fall or stand on the extent of the markups.").

**18.** As the Second Circuit implicitly recognized in *Charles Hughes & Co.*, the shingle theory was emphatically the result of federal regulation of securities markets, and of the SEC's interpretation of the securities laws:

We need not stop here to decide, however, how far common-law fraud was shown. For the business of selling investment securities has been considered one peculiarly in need of regulation for the protection of the investor. . . .

. . .

The essential objective of securities legislation is to protect those who do [not] know market conditions from the overreachings of those who do. Such protection will mean little if it stops short of the point of ultimate consequence, namely, the price charged for the securities. Indeed, it is the purpose of all legislation for the prevention of fraud in the sale of securities to preclude the sale of 'securities which are in fact worthless, or worth substantially less than the asking price.' *People v. Federated Radio Corp.*, 244 N.Y. 33, 40 154 N.E. 655, 658. If after several years of experience under this highly publicized legislation we should find that the public cannot rely upon a commission-licensed broker not to charge unsuspecting investors 25 per cent more than a market price easily ascertainable by insiders, we should leave such legislation little more than a snare and a delusion. We think the Commission has correctly interpreted its responsibilities to stop such abusive practices in the sale of securities. 139 F.2d at 437–38.

However, the decision concerned state law claims that apparently paralleled timely federal claims, and never explicitly discussed New York law or the relief that New York common law affords litigants under the shingle theory of broker liability. Indeed, the decision contains no real discussion of state law at all.

While the *Manela* court spent a much more significant amount of time discussing fraud under New York's common law, it too allowed a state fraud claim based on excessive markups to survive summary judgment alongside a timely federal claim based upon the same price inflation. 5 F.Supp.2d at 179. Rejecting defendants' motion for summary judgment on the Rule 10b–5 claim, the *Manela* court indicated that plaintiff's common law fraud claims could survive summary judgment as well— explaining that having rejected defendants' arguments "pertaining to the alleged above-market price sale ... there [was] no reason to reach a different conclusion in the common law fraud context." *Id.* While this outcome lends some measure of support to the LAB's position, it can hardly be taken as an indication that the shingle theory has become part of the fabric of New York's common law.

Moreover, that courts have commented that the basic elements of a common law fraud claim in New York are "essentially" or "largely" the same as those establishing a claim under section 10(b) and Rule 10b–5, *see Manela*, 5 F.Supp.2d at 178–79; *The Pits, Ltd. v. American Express Bank Int'l*, 911 F.Supp. 710, 719 (S.D.N.Y.1996), does not mean that all fraud claims cognizable under the federal securities laws are also cognizable under New York law, or that all theories of recovery are available under New York's common law as exist under federal law. *See* Norman S. Poser, Broker–Dealer Law & Reg. § 3.01[D][2], at 3–21 (1997) ("Liability under Rule 10b–5

does not depend on whether the defendant's activity would support an action for common law fraud, but rather on whether the activity 'constitutes . a misleading or deceptive practice in the· special Rule 10b–5 sense of· the word [fraud].'") (*quoting Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 914 (11th Cir.1987), *amended on reh'g in part*, 847 F.2d 673 (1988)); *see also In re Motel 6 Sec. Litig.*, Nos. 93 Civ. 2183(JFK), 93 Civ. 2866(JFK), 1997 WL 154011, at*5–6 (S.D.N.Y. Apr. 2, 1997); *Schultz v. Commercial Programming Unlimited Inc.*, No. 91 CIV. 7924(LJF), 1992 WL 396434, at *4 (S.D.N.Y. Dec. 23, 1992). Indeed, as the LAB itself contends in its papers, in addition to the absence of any common law "in connection with" requirement akin to that required for Rule 10b–5 claims, true shingle theory claims under the federal securities laws may not even require proof of affirmative reliance. *See Manela*, 5 F.Supp.2d at 176 n. 102. Moreover, shingle theory claims under the federal securities laws do not require a plaintiff to demonstrate that the defendant Broker knew that the plaintiff was acting in reliance on mistaken information—a showing that appears necessary under common law fraud claims based upon the withholding of "superior knowledge." *See Banque Arabe*, 57 F.3d at 155–56.[19]

The shingle theory is a theory of liability that has its genesis in a complex and wide-ranging statutory scheme. The Federal securities laws place many obligations on Brokers and others involved in the sale or trading of securities that did not exist at common law, and the markets in which those securities are exchanged have been heavily regulated pursuant to those laws. The shingle theory itself had its origins not in private litigation, but rather in SEC actions. *See In re Duker & Duker*, 6

---

**19.** To the extent that the LAB's fraud claim based on excessive markups would be dependant on such a showing, the Complaint's allegations concerning the Brokers' awareness of the Funds' reliance are deficient. Consequently, even were the Court to decide that a quasi-shingle theory claim is available under New York law, Count V of the LAB's Complaint would be dismissed.

S.E.C. at 386; *In re Trost & Co.*, 12 S.E.C. 531 (1942).

Despite the LAB's best efforts, the Funds cannot avoid the consequences of *Lampf* and/or their failures to assert claims under the federal securities laws merely by raising a state claim for fraud. Without any indication that the New York courts have ever embraced the shingle theory as part of New York's common law of fraud, this Court is chary to do so itself. Consequently, Count V of the Complaint is dismissed.

### VI. *The Brokers' Motions' to Dismiss Counts XI and XII Alleging Tortious Interference With Contracts Are Granted*

 In its Complaint, the LAB has reasserted claims of tortious interference with contracts against the Brokers, based once again on the Brokers' interference with both investment advisory agreements between the Funds and ACM (Count XI) and Public Securities Association Master Repurchase Agreements ("PSA agreements") governing the liquidation of the Funds' securities (Count XII). Though these claims essentially mirror those tortious interference claims dismissed in *Granite II*, 17 F.Supp.2d at 292–95, the LAB has both pared down these claims and supplemented its allegations.

While Count II of the LAB's First Amended Complaint alleged that Bear Stearns, DLJ, and Merrill Lynch interfered with investment advisory agreements between ACM and each of the Funds by recommending and selling to the Funds inappropriate securities, the LAB has augmented its claims in Count XI of the Complaint. The LAB still maintains that the Brokers interfered with the advisory agreements by recommending and selling inappropriate securities, but now adds that the Brokers' provision of incorrect monthly marks also interfered with those agreements. The Brokers, the LAB alleges, "knew by virtue of the October 28, 1992 Agreements and the Brokers' provision of monthly marks that ACM was contractually required to report accurately the market value of the Funds' portfolios on a monthly basis." Compl. ¶ 283. Because ACM was allegedly unable to properly advise the Funds without those marks—which the LAB contends the Brokers were uniquely able to provide—the LAB claims that the Brokers' failure to provide accurate marks constituted tortious interference with the investment advisory agreements.

Count XII remains essentially unchanged, insofar as the LAB's basic claim is concerned, with the only noteworthy alteration being that the LAB now only asserts this claim against Bear Stearns for its tortious interference with the Funds' agreements with Kidder.

In *Granite II*, the LAB's tortious interference claims were dismissed on the grounds that the First Amended Complaint had not adequately pleaded "but for" causation. 17 F.Supp.2d at 292. Though the LAB's papers manifest profound disagreement with that decision, as well as more general disagreement with this Court's articulation of New York's law of tortious interference with contractual relations, *see Mina Inv. Holdings Ltd. v. Lefkowitz*, No. 97 Civ. 1321 RWS, 1999 WL 25050, at *5–12 (S.D.N.Y. Jan. 20, 1999), the LAB has failed once again to adequately plead "but for" causation. Because it would be unduly repetitive to venture down a path that has already been well-traveled, Counts XI and XII are dismissed for essentially the same reasons stated in *Granite II*.

As far as Count XI of the Complaint is concerned, the LAB's only new pleadings of moment are those concerning the Brokers' provision of inaccurate marks. The pleadings are deficient for the very same reasons that the recommendation and sale of inappropriate securities allegations were found deficient in *Granite II*. Setting aside the Complaint's failure to adequately and credibly allege that the provision of marks,

or even monthly reportage of the Brokers' assessment of the Funds' market value, were contractual obligation of ACM to the Funds that were breached,[20] and its wholesale failure to adequately allege intent,[21] the logic of *Granite II* would apply to the LAB's mark-dependent contentions as well. *Granite II* held that the LAB's own complaint established that ACM "was pre-

disposed toward breaching its agreements with the Funds and would have done so independently of each of the Broker's actions or participation." 17 F.Supp.2d at 294. Though the LAB has artfully and conveniently trimmed various sections of its Complaint, including sections that were explicitly relied upon by this Court in rendering its earlier decision,[22] it has done

---

**20.** A prerequisite to any tortious interference claim by the LAB would, of course, be some actual breach of a contract. *See Robins v. Max Mara, U.S.A., Inc.*, 923 F.Supp. 460, 468 (S.D.N.Y.1996) (" 'In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party.' ") (*quoting Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 349, 364 N.E.2d 1119, 1120 (1977)). The LAB has failed to adequately allege that any contract between ACM and the Funds was actually breached by the Brokers' provision of inaccurate marks. A review of an investment advisory agreement between ACM and Quartz, appropriately considered given the LAB's reference to the advisory agreements in the Complaint and presumed access to such a foundational document, reveals no explicit requirement whatsoever that ACM or any other advisor provide the Funds with Broker marks.

Nowhere does the LAB indicate how the Brokers' provision of false marks would result in any real breach of the investment advisory agreements, or provide any contractual language that supports its assertions.

**21.** To maintain a claim for tortious interference with contracts, a plaintiff must also allege that the defendant intended to interfere with a contract. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir.1995); *Gruntal & Co. v. San Diego Bancorp*, No. 94 Civ. 5366(DC), 1996 WL 343079, at *3 (S.D.N.Y. June 21, 1996). In their papers, the parties have jousted over whether or not a plaintiff must plead "exclusive malicious motivation"—that the interference was for the sole purpose of harming the plaintiffs, rather than merely for the defendant's own economic gain. *See Elliott Assocs., L.P. v. Republic of Panama*, 975 F.Supp. 332, 341–42 (S.D.N.Y. 1997); *Rapp Boxx, Inc. v. MTV, Inc.*, 226 A.D.2d 324, 325, 642 N.Y.S.2d 228, 228 (1st Dep't 1996); *Benjamin Goldstein Prods., Ltd. v. Fish*, 198 A.D.2d 137, 138, 603 N.Y.S.2d 849, 851 (1st Dep't 1993). Because the LAB's Complaint does not adequately allege any intent whatsoever, or even the Brokers' aware-

ness of any contract requiring the provision of Broker marks, this issue need not be reached.

Conclusory allegations that the Brokers acted "knowingly, intentionally, purposefully, maliciously, and without regard for the rights and interests of the Funds," are not sufficient pleadings of intent. Compl. ¶ 291. The LAB's vague assertion that "[b]y virtue of their knowledge of ACM's status as a registered investment advisor, or otherwise, the Brokers knew or should have known that ACM was a party to investment advisory agreements with each of the Funds and knew or should have known of those agreements' terms" is also patently insufficient. Compl. ¶ 282. Nowhere does the LAB point to any facts indicating awareness on the Brokers' part that the advisory agreement required ACM to obtain accurate Broker marks, let alone any language in those agreements that even demanded those marks. Further, the LAB's assertion that the Brokers knew of ACM's contractual obligation to provide marks to the Funds "by virtue of the October 28, 1992 Agreements," Compl. ¶ 283, is hardly adequate given the specific language of the October 28, 1992 letters. Nowhere do the October letters ever state that ACM is contractually obligated to provide the Funds with Broker marks.

Consequently, even had the LAB successfully pleaded "but for" causation, its failure to adequately plead intent would merit dismissal.

**22.** *Compare* First Am. Compl. ¶ 4 ("Bear Stearns, DLJ, and Merrill Lynch ... were among the principal sellers of CMOs to the Funds"), *with* Compl. ¶ 4 ("Bear Stearns, DLJ, and Merrill Lynch ... sold CMOs to the Funds"). In *Granite II*, ¶ 4 of the LAB's First Amended Complaint was specifically relied upon by this Court in ruling that the LAB's own pleadings negated any possibility of "but for" causation:

Despite the words "direct result" in the Complaint, the facts alleged negate the possibility that the Brokers' alleged actions were the "but for" cause for the alleged breaches of contract. After all, the LAB maintains that numerous dealers, including

**268**

nothing that changes this outcome as to its tortious interference claims.

The LAB's Complaint still alleges that "ACM and Askin repeatedly breached their fiduciary and contractual relations to the Funds to make investments with due care and in accordance with the Funds' stated investment objectives." Compl. ¶ 79. As described in more detail with regard to the LAB's new common law fraud claim against DLJ and Comerford, the Complaint still establishes that ACM itself approached its investment advisory agreements with the Funds with abandon. *See supra* at 70–74.

While the LAB's earlier claim regarding purchases of inappropriate securities alone is distinct from its later, marks-supplemented claim, the LAB's own pleadings still indicate that ACM and Askin approached the investment advisory agreements with either carelessness or ineptitude, failing to exercise even the most rudimentary diligence in evaluating, selecting, or valuing the bonds which were purchased and held by the Funds. This being the case, it can hardly be said by the LAB that the defendant Brokers' failures to supply accurate marks was the "but for" cause of any breach of ACM's contractual duties to provide accurate valuations of the Funds' holdings. Valuation and evaluation of the esoteric securities held by the Funds was, presumably, a complicated and difficult task that was entrusted to ACM precisely because it could do the job properly. In fact, as the LAB's own pleadings establish, ACM made no credible attempt whatsoever to evaluate the Funds' securities, did not "possess or employ adequate analytic models, did not understand how certain CMOs, particularly inverse IOs, would react to changes in interest rates, and were unable to determine the effective duration of the Funds' portfolios." Compl. ¶ 85. Just as ACM's careless approach to selecting securities leads to the conclusion that it was predisposed towards breaching its obligations to the Funds by making inappropriate purchases from other broker-dealers, its lackluster approach to valuing the Funds' holdings leads to the conclusion that it was predisposed towards providing inaccurate or incomplete valuations of the Funds' holdings—no matter what marks the Brokers may have provided. Indeed, any dependence that ACM might have had on broker marks alone might itself have constituted a breach of its obligations to provide the Funds with appropriate valuations, given the Complaint's own assertion that ACM and Askin breached their fiduciary and contractual duties to the Funds by exposing the Funds to "near-complete 'market'—*i.e.,* Broker—control." Compl. ¶ 79.

Regarding Count XII even less discussion is necessary. In the First Amended Complaint the LAB alleged that Bear Stearns, Rubin, DLJ, and Merrill Lynch had all interfered with the PSA and other agreements between the Funds and each of the Brokers. The gravamen of the LAB's current claim, as with Count XII of the First Amended Complaint, is that the collusive bidding process engaged in by the Brokers interfered with PSA and other agreements governing liquidation of the Funds' portfolios. In *Granite II,* this claim was dismissed as against all of the Brokers, given that the LAB's own pleadings alleged collusive conduct on the part of all of the Brokers. Because each Broker was itself part of the alleged bidding conspiracy, *Granite II* held, the LAB could not simultaneously allege that "each Broker's conduct was the causal force behind the purported breaches of contract by the

---

nonparties, were selling inappropriate securities to the Funds. (*See* Compl. ¶ 4 (acknowledging that the Brokers were "among" the principal sellers of CMOs to the Funds).). Thus, according to the Complaint, even if ACM had not purchased CMOs from each of the Brokers, it would

have breached its contractual obligations to the Funds by making purchases from other broker-dealers.

17 F.Supp.2d at 292. Despite the LAB's careful pruning of its Complaint, it does not now allege that the Brokers were the only sellers of CMOs to the Funds.

other broker-dealers." 17 F.Supp.2d at 295.

The LAB's rehashing of its prior pleadings, albeit with some greater specificity, and revision of Count XII to only assert a claim against Bear Stearns do not now allow it to succeed where it has previously failed. The Complaint still establishes that all of the Brokers, including both Bear Stearns and Kidder, were participants in a collusive bidding scheme. Compl. ¶ 249. While the current limitation of the claim to Bear Stearns' interference with agreements between the Funds and Kidder makes the LAB's pleading infirmities less obvious than was the case with the First Amended Complaint, the LAB's inability to allege "but for" causation remains.

Because the LAB's own pleadings belie any assertion that any of the Brokers' conduct was the "but for" cause of any breaches of contract, whether they be investment advisory contracts between ACM and the Funds, agreements between Kidder and the Funds, or any other agreements, the tortious interference with contract claims in Counts XI and XII of the Complaint are dismissed. Since the LAB's allegations fail to state a claim, the Brokers' contentions that the LAB's tortious interference claims are barred by New York's three-year statute of limitations need not be addressed.

### Conclusion

For the reasons set forth above, the Brokers' motions for partial dismissal of the Complaint are granted in part and denied in part.

Specifically, the Brokers' motions to dismiss the LAB's claims for common law fraud (Counts IV and VI), tortious interference with contracts (Counts XI and XII), and violations of the Sherman and Donnelly Acts (Counts VI and VII, respectively), are hereby granted.

The Brokers' motions to dismiss the LAB's claim for breach of contract (Count III) are denied.

It is so ordered.